Filed 12/17/13  P. v. Bernal CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B243701 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA381640) |
| v. | |
| MIGUEL A. BERNAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Dennis J. Landin, Judge.  Affirmed as modified.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Miguel A. Bernal of attempted murder (Pen. Code, §§ 664, 187, subd. (a)).[1] The jury found that defendant had personally discharged a handgun that resulted in great bodily injury (§ 12022.53, subds. (b)-(d)) and that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2]

After denying defendant's motion for a new trial, the trial court sentenced defendant to state prison for an indeterminate term of 40 years to life. The sentence consisted of the low term of five years for the attempted murder, plus 10 years for the gang enhancement and an indeterminate term of 25 years to life for the gun allegation under section 12022.53, subdivision (d). The court gave defendant 559 days of presentence custody credit for 559 actual days. The court granted no conduct credits.

Defendant appeals on the grounds that: (1) the evidence was insufficient to support his conviction for attempted murder; (2) he is entitled to 84 days of conduct credit under section 2933.1; and (3) the abstract of judgment must be corrected.

### FACTS

**Prosecution Evidence[3]**

In November 2010, Edgar Bocanegra worked in a building located near the intersection of Union Pacific Avenue and Alma Avenue in East Los Angeles. Bocanegra often saw gang graffiti in this area. At approximately 10:00 a.m. on November 15, 2010, Bocanegra was standing on the street across from his building while talking with a friend. Bocanegra noticed a gray Lincoln Navigator going westbound on Union Pacific Avenue.

---

[1]    All further references to statutes are to the Penal Code unless stated otherwise.

[2]    Following defendant's conviction and sentencing on the attempted murder charge in count 1, the trial court dismissed count 2, which had been severed for trial, on the prosecutor's motion. Count 2 charged defendant with being a felon in possession of a firearm. (§ 12021, subd. (a)(1).)

[3]    Defendant was  tried along with a codefendant, Reyes Renteria, who was known as "Shy Boy."  We do not recite the evidence that pertains solely to Renteria, who entered into a plea agreement before jury deliberations began.

When the driver parked on Union Pacific Avenue, a man jumped out of the car from a passenger seat. Bocanegra later identified the passenger as defendant. Defendant looked like a gang member and began to run with a spray can in his hand toward the side of the building where Bocanegra worked. Bocanegra believed defendant was going to spray paint on the side of the wall. Bocanegra did not follow defendant.

Bocanegra soon saw defendant come around to the front of the building, and it appeared he was going to start spray painting there. Bocanegra proceeded to cross the street. When he was within 20 feet of defendant, he said, "Hey, man, what's up?" Defendant stepped off the sidewalk and began crossing toward Bocanegra. When he got within two or three feet, Bocanegra asked him why he was doing that to his own "raza," or race. Defendant cursed at Bocanegra and feigned a swing at him with his left hand. Defendant then raised his paint can with his right hand and sprayed Bocanegra. Bocanegra put up his hand but nevertheless got some black paint on his face and hand. Bocanegra feigned a swing at defendant, and defendant started running.

Bocanegra chased after him. When Bocanegra was six feet from defendant and thought he was catching up to him, defendant turned around "a little bit" and extended his left arm behind him. Bocanegra heard a "boom." He felt the wind knocked out of him and stopped running. He looked at his shirt and saw a little red dot about six inches above the navel. Bocanegra began to feel dizzy. Defendant kept running.

Bocanegra went back to his building and asked someone to call 911. Paramedics and sheriff deputies arrived. Bocanegra was taken to the hospital and later underwent surgery. A bullet inside him was not removed. He has a scar from the middle of his chest to his navel and still suffers the aftereffects of the shooting, such as taking medication to control his bowel movements. He had to have stents put in his arteries because the bullet scraped one of his arteries. He cannot engage in the physical activities he enjoyed before the shooting, such as playing sports.

Bocanegra did not hear the name of a gang spoken that day. He did not see the person actually tag anything on the walls.

3

Detective Eduardo Aguirre later showed Bocanegra several photographs, but Bocanegra did not recognize anyone, although he believed that some of the pictures might be the man who shot him. He remembered a broad nose and wide nostrils, and he believed one of the pictures showed someone with these features. He identified a gray Lincoln Navigator that looked like the one he saw that day. At trial and at the preliminary hearing, Bocanegra identified defendant as the man who shot him. As soon as he saw him in person, Bocanegra felt that he wanted to collapse.

Bocanegra acknowledged that he had a 1994 conviction for robbery.

On the day of the shooting, Irving Romero was in the mechanic shop where he worked when he heard a gunshot. The shop was located between Indiana Street and Alma Avenue. He quickly went outside and saw a male, whom he later identified as defendant, run past him. Romero recalled that defendant had something wrapped around his hand. Detective Aguirre showed Romero a photographic lineup three months after the shooting, and Romero selected defendant's photograph.

Los Angeles County Deputy Sheriff Vincent Cisneros responded to Bocanegra's workplace. When he was asked who shot him, Bocanegra said it was "a silver Lincoln Navigator." Deputy Cisneros and other deputies searched for shell casings but found none. Detective Aguirre believed that the absence of shell casings indicated that the gun used was a revolver.

Deputy Cisneros went to the northwest-facing wall of the building where he saw some graffiti that said "Indiana Dukes SX3." It appeared to have been spray painted very recently, since the paint smelled fresh and was still wet. Deputy Cisneros photographed the graffiti.

Approximately three months after the shooting, Deputy Daniel Parra of the Los Angeles County Sheriff's Department was driving a marked patrol vehicle down Union Pacific Avenue when he saw defendant. As the deputy passed him, he saw defendant kneel down at the curb beside a vehicle. Defendant appeared to be reaching underneath the rear quarter panel of the vehicle. The deputy made a U-turn, and defendant began walking away from the parked car. Deputy Parra contacted defendant.

4

They went back to the vehicle, and the deputy found a handgun, a .38-caliber Smith and Wesson revolver, in the area where defendant had been reaching. The gun was loaded with four rounds. Deputy Parra arrested defendant.

Detective Aguirre interviewed defendant a few days later. Defendant initially denied being involved in any shooting. He later acknowledged that he was involved in the shooting at Union Pacific Avenue and Alma Avenue on the date in question. Defendant said that Bocanegra looked mean, and it looked as if Bocanegra wanted to hit him or something. Defendant said that the victim should not have tried to be a hero by chasing him. He said he believed the victim had a 50/50 chance of catching him. When asked if the gun that Deputy Parra found with defendant was the same gun used in the shooting, defendant said he was not sure. Defendant had been a member of the Indiana Dukes since he was 11 years old, but he claimed he did not tag. At the time of the shooting, he had his gun in a holster at his waist on the left side. He stated that he knew no one called Shy Boy and no one who drove a Lincoln Navigator.

Detective Aguirre heard a telephone call made by defendant and an Indiana Dukes gang member with the moniker "Grumpy." The call was made approximately two days after defendant's interview. The call was played for the jury. Detective Aguirre also had a copy of a conversation that took place on March 6, 2011, when defendant was conversing with a gang member called "Dopey." This conversation was also played for the jury.

In the first conversation defendant recounted some of the information that Detective Aguirre had confronted him with and stated, apparently in reference to Shy Boy, "that guy is a fucking rat, dude," and "that fool's a snitch, homie." He said Shy Boy had ratted him out personally. He stated that, "there was only me, this fucking fag, and the victim." When Grumpy asked defendant if "they got paperwork on that fool already," defendant replied that he did not need paperwork because of what the cops told him. In the second conversation, defendant tells Dopey that, "The bitch ass homie dudes *** wanted to go hit up the wall. And then, you know me fool, I'm never naked fool." Detective Aguirre testified that "naked" in this context meant "armed." Defendant also

stated, "You know who is behind this shit? That bitch ass Shy, fool. That fool no good dawg."

Detective Aguirre testified as a gang expert. He explained gang behavior and rituals, in particular with regard to putting up graffiti, or tagging. Tagging is used to claim territory. He testified about incidents where civilians had confronted taggers and been shot. Deputy Aguirre was familiar with the Indiana Dukes gang and had investigated crimes involving that gang. It has been in existence since the mid '70's and has approximately 50 documented members. They tag their whole name or "IDKS." Detective Aguirre had investigated numerous shootings involving the gang as victims and suspects. Detective Aguirre testified regarding the gang's territory, rivals, and tattoos. The location of the shooting is one of the areas they claim, and their rivals, Easy Riders, also claim it. The Indiana Dukes constantly mark up walls and anything else they can paint.

Detective Aguirre testified that violent crimes enhance the reputation of a gang. The primary activities of the Indiana Dukes include murder, shootings, extortion, robbery, possession of handguns, vehicle theft, vandalism, and narcotics sales. Detective Aguirre testified regarding felony convictions suffered by members of the Indiana Dukes.

Detective Aguirre did not know defendant or the codefendant before he investigated the shooting, but he researched them before coming to court to testify by using departmental resources. With respect to defendant, the detective looked at field identification cards and crime reports, and he spoke to other police officers and deputies who had come into contact with him. Defendant had numerous Indiana Dukes tattoos on his body and had admitted membership to Detective Aguirre and to two other detectives. Defendant's moniker is "Little Man."

When given a hypothetical situation based on the facts of the case, Detective Aguirre was of the opinion that the instant crime was committed in association with, at the direction of, or for the benefit of the Indiana Dukes gang. The detective explained that the shooting occurred in an area that the gang was constantly attempting to take over. The crime sent a message to rival gangs and to people who lived in the area. The

6

shooting involved a civilian who lived or worked in the area, confronted a gang member, and showed him disrespect in his neighborhood. Shooting this person benefited the gang because it instills fear within the community, enabling the gang continue its criminal activity while knowing that people will not report gang crimes. It also benefited the Indiana Dukes gang member because he would earn credit for shooting someone who disrespected the Indiana Dukes neighborhood. The crime would enhance his reputation.

**Defense Evidence**

Daniel Laughlin was called by defendant's codefendant as a gang expert. He has worked for the City of Los Angeles in Watts for the last 10 years codeveloping educational programs for youth. In the past, he had brokered peace alliances between rival gangs. Laughlin was familiar with the Indiana Dukes. Laughlin testified that many former gang members never get tattoos removed because the process is time consuming and expensive. He believed that defendant's codefendant was no longer a member of the Indiana Dukes gang. Given a hypothetical question that assumed that a former gang member gave a ride to a gang member and dropped him off and that assumed the facts of the ensuing shooting, Laughlin believed that the driver did not act for the benefit of the gang. Laughlin acknowledged that the person who spray painted the wall and shot at the victim could have done so for the benefit of the gang. Spray painting the gang name promotes the gang.

**DISCUSSION**

**I. Sufficiency of the Evidence**

*A. Defendant's Argument*

Defendant contends that his judgment must be reversed because no rational juror could have found beyond a reasonable doubt that he intended to kill Bocanegra. Even if this Court finds sufficient evidence of intent to kill, defendant's conviction must still be reversed because no rational juror could have found proof beyond a reasonable doubt that he intended to kill Bocanegra unlawfully instead of finding that defendant shot in the honest belief in the need for self-defense or in the heat of passion upon a sudden quarrel. Defendant emphasizes that he was running away.

7

Defendant adds that gang evidence permeated the case through the expert's testimony, the introduction of the predicate offenses, and the playing of two jail telephone calls. He asserts that the specter of the gang was a significant factor leading the jury to find attempted murder rather than attempted manslaughter.

According to defendant, the case must be remanded to the trial court with instructions to revisit, reconsider, and grant defendant's motion for new trial based on insufficiency of the evidence of express malice and to reduce the offense to attempted voluntary manslaughter.

## B. Relevant Authority

The standard of appellate review for sufficiency of the evidence was set out in *People v. Johnson* (1980) 26 Cal.3d 557. When an appellate court seeks to determine whether a reasonable trier of fact could have found a defendant guilty beyond a reasonable doubt, it "'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Id*. at p. 576.) "Substantial evidence" is evidence that is "reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Id*. at p. 578.)

Given this court's limited role on appeal, appellants bear an enormous burden in claiming there was insufficient evidence to sustain the verdict. If a verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact and not retry the case ourselves. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) It is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence. (*People v. Alcala* (1984) 36 Cal.3d 604, 623.) "Reversal on [sufficiency of the evidence] ground[s] is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted

8

murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

Direct evidence of a defendant's intent to kill is rare. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt . . . ." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946.)

### C. Proceedings Below

In addition to giving instructions on attempted murder, the trial court instructed the jury on voluntary manslaughter under the theories of both heat of passion and imperfect self-defense as lesser included offenses The trial court also gave instructions on the right to self-defense (CALCRIM No. 3470), the right to self-defense of an initial aggressor (CALCRIM No. 3471), the fact that the right to self-defense may not be contrived (CALCRIM No. 3472), and the ending of the right when the danger no longer exists (CALCRIM No. 3474).

### D. Evidence Sufficient

The mental state required to convict a defendant of attempted murder may be inferred from the defendant's acts and the circumstances of the crime, since there is rarely direct evidence of the defendant's intent. (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.) That is, the act of firing toward the victim at a close, but not point-blank range in a manner that could have inflicted a mortal wound had it hit its target, is sufficient to support an inference of intent to kill. (*Ibid*.; see also *People v. Chinchilla*, *supra*, 52 Cal.App.4th at p. 690.) The shooter's purposeful use of a lethal weapon will give rise to an inference of intent to kill "'*even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance*.'" (*People v. Smith*, at p. 741.)

Here, defendant was running away from his pursuer when he turned and shot him in the stomach. The fact that Bocanegra survived does not preclude a finding of intent to kill. "'[T]he fact that the victim may have escaped death because of the shooter's poor

marksmanship [does not] necessarily establish a less culpable state of mind.'" (*People v. Chinchilla*, *supra*, 52 Cal.App.4th at p. 690.) Defendant did not merely show his gun or shoot wide to warn off Bocanegra, he hit him in a vulnerable area of his body. Substantial evidence of intent to kill can be inferred from the fact defendant used a deadly weapon—a firearm—and targeted a vital area of the victim's body, such as the abdomen. (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [sufficient evidence of intent to kill shown from the defendant's act of stabbing the victim in the abdomen, an "extremely vulnerable area of the body," with "all his might and effort"]; *People v. Bolden* (2002) 29 Cal.4th 515, 561 ["defendant could have had no other intent than to kill" when he plunged the knife deeply into a "vital area of the body of an apparently unsuspecting and defenseless victim"].) The jury could reasonably infer defendant's intent to kill from his conduct.

With respect to the imperfect self-defense theory of voluntary manslaughter, defendant acknowledges that this doctrine cannot be invoked by a defendant who has created circumstances in which his adversary's pursuit or attack is legally justified. (See *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Defendant argues, however, that if he did not act with wrongful intent in creating the circumstances leading to the need for self-defense, then malice is negated even if he had some responsibility for the conflict. Defendant cites *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180, in which the court held that, when the victim's use of force against the defendant is unlawful, the imperfect self-defense theory is available to the defendant, even if the defendant was responsible for setting in motion the chain of events that led the victim to attack the defendant. (*Id.* at pp. 1179-1180.)

*People v. Vasquez* is readily distinguishable. In that case, the error occurred in the trial court's refusal to instruct the jury on imperfect self-defense. (*People v. Vasquez*, *supra*, 136 Cal.App.4th at p. 1180.) In the instant case, the jury had the opportunity to decide whether the evidence showed defendant had an honest belief in the need to defend himself, and it determined that he did not.

10

Furthermore, *People v. Vasquez* noted that in that case and in *People v. Randle* (2005) 35 Cal.4th 987, the evidence suggested that the victims and not the defendants used unlawful force first. (*People v. Vasquez*, *supra*, 136 Cal.App.4th at p. 1180; see *People v. Randle*, at pp. 992–993, 1002–1003 [defendant who was caught burgling a car was entitled to use deadly force in imperfect defense of another against burglary victim who was savagely beating his coperpetrator].) These cases are unlike the circumstances of the instant case. Bocanegra first addressed defendant by asking him, "What's up?" Defendant then turned around and came toward Bocanegra, at which point Bocanegra asked another question, "Why are you doing this to your own race?" At that point defendant said "bad words" to Bocanegra and took a swing or feigned a swing at him and sprayed him with paint. Bocanegra responded by feigning a swing at defendant, at which point defendant ran, and Bocanegra ran after him. There was no evidence that Bocanegra used unlawful force against defendant to the degree that a reasonable jury could infer that defendant honestly believed he needed to shoot Bocanegra to defend himself.

With respect to the heat of passion theory of voluntary manslaughter, it is well established that "'[h]eat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.] [¶] 'Heat of passion' will reduce murder to voluntary manslaughter only if there is adequate provocation. The victim's conduct 'must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 561-562.) Defendant has the burden of producing sufficient evidence on heat of passion to raise a reasonable doubt of his guilt of murder or attempted murder, unless the prosecution's own evidence suggests one of these mitigating theories. (*People v. Rios* (2000) 23 Cal.4th 450, 461-462.)

In the instant case, there was no evidence that Bocanegra did anything that could be interpreted as adequate provocation causing defendant to act rashly and without

11

deliberation. Defendant was running away after having attacked Bocanegra by spraying paint on him. A reasonable jury could conclude that the fact that Bocanegra chased after defendant was not objectively sufficient provocation entitling defendant to a verdict of voluntary manslaughter. A defendant may not "'set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused.'" (*People v. Wickersham* (1982) 32 Cal.3d 307, 326.) Defendant's act of turning around and firing at Bocanegra did not have the markings of a rash act but rather a deliberate one designed to show Bocanegra that he "shouldn't have been trying to be a hero."

Finally, defendant's arguments regarding the specter of the gang evidence as having led to the verdict of attempted murder lacks merit. The gang evidence was clearly admissible and necessary to prove the gang allegation. (See *People v. Romero* (2008) 44 Cal.4th 386, 412, fn. 2.) The jury was instructed that it must first decide whether defendant committed the crime charged in count 1 before deciding whether the prosecution had proved the gang allegation. (CALCRIM No. 1401.) The trial court instructed the jury that it could consider evidence of gang activity only for the limited purpose of deciding if the defendant acted with the intent and knowledge required to prove the gang-related crime and enhancements charged, or in deciding that defendant had a motive to commit the charged crime, and not for any other purpose. (CALCRIM No. 1402.) We presume, having no indication to the contrary, that the jury followed the proper written instructions it received in the instant case. (*People v. Callahan* (1999) 74 Cal.App.4th 356, 372.) We note that the jury found that defendant did not commit the attempted murder with premeditation and deliberation, which shows that it carefully considered the evidence of each element of the charged offense and the instructions.

Accordingly, since substantial evidence supports the jury's finding that defendant intended to unlawfully kill Bocanegra, the conviction for attempted murder must stand.

## II. Conduct Credits

### A. Defendant's Argument

Defendant contends the trial court erred by not awarding him any conduct credits. According to defendant, he is entitled to 84 days of conduct credits. Respondent agrees, but asserts that the number of days to which defendant is entitled is 83.

### B. Conduct Credits Must Be Awarded

The trial court awarded defendant 559 days of custody credit. *People v. Duff* (2010) 50 Cal.4th 787, 793, held that "[t]he circumstance that a defendant is sentenced to an indeterminate sentence does not preclude the earning of presentence conduct credit." Section 4019 authorizes an award of presentence conduct credit, but the amount of presentence conduct credit is limited to 15 percent under section 2933.1. This section provides that "any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit." (§ 2933.1, subd. (a).) Section 667.5, subdivision (c) includes any felony punishable by life imprisonment, attempted murder, and firearm enhancements under section 12022.53, subdivision (d). (§ 667.5, subds. (c)(7), (12), (22).) Since defendant's crimes and his sentence fall within section 667.5, he is entitled to conduct credit of no more than 15 percent of the 559 days he actually spent in custody. Fifteen percent of 559 days totals 83.85 days. Therefore, defendant is entitled to 83 days of presentence conduct credit, and not the 84 days he claims. (*People v. Ramos* (1996) 50 Cal.App.4th 810, 816 [defendant is awarded greatest whole number of days that does not exceed 15 percent of actual days].)

## III. Abstract of Judgment

Defendant points out that the jury found "not true" the premeditation allegation, yet the abstract of judgment indicates that defendant was convicted of attempted willful, deliberate, premeditated murder in count 1. Second, the abstract indicates the amount of defendant's restitution fine (§ 1202.4) and parole revocation restitution fine (§ 1202.45) as $240 each rather than the $200 the trial court imposed. Respondent agrees with defendant that the abstract of judgment must be corrected in these two respects, as does this Court. We therefore order the abstract to be amended.

## DISPOSITION

The judgment is modified to award defendant 83 days of conduct credits in addition to his 559 actual days.  In all other respects, the judgment is affirmed.  The superior court is directed to amend the abstract of judgment to correctly reflect the title of defendant's crime (attempted murder without premeditation) in section 1; to amend the amounts of the restitution fines to $200 in section 5; and to correct the number of conduct credits and total credits in section 12.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.