[No. C036773. Third Dist. Mar. 12, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES McKINLEY MOORE, Defendant and Appellant.

## COUNSEL

Madeline McDowell, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Assistant Attorney General, W. Scott Thorpe and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—In this case involving an attempted willful, deliberate and premeditated murder, we hold that the trial court did not err in refusing

a request to instruct on the partial defense of mental disease, defect, or disorder (CALJIC No. 3.32), where defendant elicited no expert testimony that he suffered from a mental disease, defect, or disorder at the time of the offense.

We also hold that substantial evidence supports defendant's conviction for attempted willful, deliberate and premeditated murder.

We also hold that the trial court did not err when it gave a certain jury instruction when the jury reported a deadlock.

A jury convicted defendant Charles McKinley Moore of attempted murder (Pen. Code, §§ 664, 187, subd. (a)),[1] count one, and found the attempted murder to be willful, deliberate and premeditated (§§ 664, subd. (a), 187, 189.) The jury also convicted defendant of assault with a deadly weapon (§ 245, subd. (a)(1)), count two. The jury also found true that during the commission of both offenses defendant used a deadly weapon (§ 12022, subd. (b)(1)) and inflicted great bodily injury (§ 12022.7, subd. (a)). Defendant received a sentence of life with the possibility of parole plus a consecutive four-year term.

On appeal, defendant argues (1) there is no substantial evidence to support defendant's conviction for attempted murder or the jury's finding of a willful, deliberate and premeditated attempted murder; (2) the trial court erred in refusing to instruct the jury with CALJIC No. 3.32; and (3) the trial court's instruction to the deadlocked jury regarding further deliberation was improper. We shall affirm.

FACTS

On the morning of February 7, 2000, the victim, Christine S., arrived in her vehicle in the area near McClatchy Park in Sacramento. The victim was to attend a meeting scheduled to take place at 11:30 a.m.

The victim parked her vehicle on 35th Street and, because she was early, decided to remain in her vehicle to finish the apple she was eating. While sitting in her vehicle, the victim noticed defendant standing approximately a block away, "kind of hanging out," and looking in her direction. A brown car then pulled up and parked near where defendant was standing. The victim observed defendant walk toward the front of the brown vehicle. When defendant got within three feet of the vehicle he stopped, then backed away to his original position while still facing the car. The victim continued to eat her apple, losing track of defendant.

---

[1] Undesignated statutory references are to the Penal Code.

After approximately 10 to 15 minutes, the victim got out of her car with the intention of attending her meeting. As she walked toward the entrance of the building where the meeting was to take place, defendant came out of a doorway and lunged at her with a knife, sticking it into her abdomen. The victim likened the impact to being hit by a train, claiming defendant stabbed her with all of his might and effort.

The victim, a green belt in martial arts, reacted by striking defendant with her elbow, backing him off her. The victim credited this maneuver with saving her life. After being stabbed, the victim entered the building and emergency personnel were called to assist.

Security guard Ruben Cantu responded to the scene and made contact with defendant, who admitted he had stabbed the victim. Cantu described defendant as quiet and cooperative.

Sacramento Police Officer Larry Barja also responded. When Barja arrived, he noticed defendant on the ground, with Cantu holding defendant at gunpoint. Barja handcuffed defendant and placed him in the patrol car. Defendant told Barja that he stabbed the victim because he " 'just felt like doing it.' " Defendant did not know the victim, but stabbed her because " 'she was here at the time. Wrong place, wrong time, so to speak.' " If the victim had not been present, defendant would have stabbed someone else: he " 'just wanted to stab somebody.' " Barja described defendant's mood as quiet, calm and cooperative. Defendant had no trouble relating personal information to the officer upon request, including that he had no mental history and was not under a doctor's care.

The knife used in the stabbing had a brown and white handle and was eight inches long, with a blade that was approximately four inches long.

Amy G., who worked at the building where the meeting was to take place, made contact with defendant immediately after the stabbing. Amy testified defendant's eyes looked glazed and he appeared to be under the influence.

As she was being wheeled to an ambulance, the victim identified defendant as the person who stabbed her.

The medical testimony established the victim sustained a single stab wound to the right abdomen. The wound, three to four inches deep, penetrated the victim's fascia and abdominal cavity, causing injury to a kidney and the mesentery of her colon. The victim required surgery, and eventually spent eight days in the hospital and over eight weeks convalescing. The stab wound posed a substantial risk of death.

## DEFENSE

Testifying on his own behalf, defendant claimed he had a good recollection of the events that occurred on February 7, 2000. Defendant had never met or spoken to the victim prior to that time, had never been under the care of a psychiatrist or psychologist, nor had he been prescribed any type of medication.

Defendant testified he had been homeless and was not getting much sleep. He had no money, nor had he eaten in the day or so leading up to the stabbing.

Defendant claimed he had used rock cocaine on and off since 1991. He estimated he had smoked it one to two thousand times. However, he had not smoked the drug for two months prior to the evening of February 6, when he met some men in downtown Sacramento and together they smoked rock cocaine through most of the night. Defendant believed he smoked between three-quarters to one gram of rock cocaine, taking his last hit around the time the sun came up on February 7, 2000.

Defendant then walked to McClatchy Park and, after staying there for a while, moved across the street to the building where the victim's meeting was to take place. Defendant denied approaching the man in the brown car or intending to stab him.

Defendant testified he sat in the alcove for about 10 to 15 minutes. He pulled out his knife to clean his fingernails. At that time, defendant thought of stabbing someone. Defendant claimed he was feeling anxious, paranoid, and depressed because of the cocaine he had smoked.

After a short time, defendant got up to walk back downtown. When he emerged from the alcove, he again had the thought of stabbing someone. At that time he saw the victim, just outside the alcove.

According to defendant, everything happened quickly. He held his knife in his right hand and as he approached the victim, he stabbed her and then kept walking. Although he wanted to stab the victim, he had no intention of killing her. Instead, he just wanted to see what it would be like to stab someone.

After the stabbing, defendant walked a few steps and then stopped, dropping the knife to the ground. He then yelled to Amy and another woman to call the police and "get the lady some help, she [has] been stabbed."

On cross-examination, defendant testified it was his intent to stab someone on the day in question. Defendant believed the "dope" was the reason he committed the act, although he never mentioned this fact to the police or to the attending nurse when he was taken to the hospital immediately after the incident. To the contrary, defendant denied using drugs when asked by the nurse.

Dr. Fred Rosenthal also testified on behalf of the defense. Dr. Rosenthal, a physician practicing psychiatry and certified in psychology and neurology, testified he has treated thousands of patients involved in the use of cocaine.

Dr. Rosenthal did not interview defendant. Instead, his testimony consisted of explaining, generally, the effects rock cocaine can have on people using the drug. Dr. Rosenthal explained rock cocaine is usually smoked and acts as a stimulant, causing increases in blood pressure, temperature and heart rate. The drug is extremely addictive and produces an abnormal chemical environment in the brain.

Dr. Rosenthal further testified it is not uncommon for a chronic user to develop delusional ideas, including becoming psychotic, hearing voices and having visual hallucinations. A person in a psychotic state can become irrational, compulsive, and impetuous and lack control over his behavior. These effects can be exacerbated by sleep deprivation and by failure to eat properly. Memory can also be impaired by the use of cocaine.

On cross-examination, Dr. Rosenthal conceded that not all users become psychotic or irrational. Dr. Rosenthal further conceded the effects of rock cocaine can vary from person to person. Because Dr. Rosenthal did not examine defendant, he did not provide any opinion whether defendant was suffering from a drug-induced psychosis at the time of the stabbing.

I.

■ Defendant contends no substantial evidence supports either the attempted murder conviction or the willful, premeditated, and deliberate attempted murder finding. Defendant argues there is no substantial evidence of an intent to kill, or of a preconceived design or careful thought or reflection preceding the stabbing incident.

The trial court instructed the jury with CALJIC No. 8.66 as follows:

"Defendant is accused in Count One of having committed the crime of attempted murder, in violation of Sections 664 and 187 of the Penal Code.

"Every person who attempts to murder another human being is guilty of a violation of Penal Code sections 664 and 187.

"Murder is the unlawful killing of a human being with malice aforethought.

"In order to prove attempted murder, each of the following elements must be proved;

"1. A direct but ineffectual act was done by one person towards killing another human being; and

"2. The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being.

"In deciding whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the killing or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt. However, acts of a person who intends to kill another person will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to kill. The acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design."

We conclude this instruction correctly defines the crime of attempted murder, and defendant does not contend otherwise. (See §§ 664, 187, subd. (a); *People v. Guerra* (1985) 40 Cal.3d 377, 386-387 [220 Cal.Rptr. 374, 708 P.2d 1252].)

The trial court also instructed the jury with CALJIC No. 8.67 as follows:

"It is also alleged in Count One that the crime attempted was willful, deliberate, and premeditated murder. If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true.

" 'Willful' means intentional. 'Deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of consider-ations for and against the proposed course of action. 'Premeditated' means considered beforehand.

"If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is attempt to commit willful, deliberate, and premeditated murder.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances.

"The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation.

"To constitute willful, deliberate, and premeditated attempted murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being.

"The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true.

"You will include a special finding on that question in your verdict, using a form that will be supplied for that purpose."

We conclude this instruction correctly defines the penalty provision providing for increased punishment for a willful, deliberate, and premeditated attempted murder, and defendant does not contend otherwise. (See §§ 664, subd. (a), 187, 189; *People v. Bright* (1996) 12 Cal.4th 652, 669 [49 Cal.Rptr.2d 732, 909 P.2d 1354].)

In our view, defendant's conduct reasonably demonstrated a willful attempt to kill following deliberation and premeditation. By his own admission, defendant sat in the alcove of the administration building, thinking of stabbing someone with the knife he would ultimately use to carry out such act. Soon thereafter, defendant left the alcove, again contemplating the same course of conduct. As defendant testified, he intended to stab someone that day and acted on his course of conduct by lunging at the victim and stabbing her in the abdomen. Defendant's trial testimony simply reaffirmed what he

told Officer Barja at the scene; he felt like stabbing someone and the victim just happened to be in the wrong place at the wrong time. These facts demonstrate defendant reflected upon a certain course of conduct and acted on that intent when the victim approached.

If there were any doubt as to defendant's state of mind, that doubt was erased by defendant's postincident statements to Officer Barja. In those statements, defendant all but admitted he stabbed the victim only after considering and weighing the consequences of his action.

Defendant argues there is no evidence of a specific intent to kill, highlighting his testimony he intended to stab but not to kill the victim. However, defendant stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable area of the body. Further, defendant's testimony he intended only to stab but not to kill is illogical considering that, according to the victim, defendant lunged at her and stabbed her with all his might and effort. The victim likened the force of the impact to being struck by a train. While a less violent attack might have been consistent with the claim of an intent to stab but not to kill, this was not such an attack.

Substantial evidence supports the jury's finding defendant intended to kill and that his efforts were willful, deliberate, and premeditated.

## II.

■ Defendant argues the trial court erred in denying his request to instruct the jury with CALJIC No. 3.32 (evidence of mental disease— received for a limited purpose). This instruction states in relevant part:

"You have received evidence regarding a mental disease, mental defect or mental disorder of the defendant at the time of the commission of the crime charged. You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent, premeditated, deliberated or harbored malice aforethought which is an element of the crime charged."

Defendant argues CALJIC No. 3.32 was warranted because his mental condition was relevant to whether he harbored malice aforethought and/or premeditated and deliberated his actions. As we shall explain, the trial court correctly refused the instruction because there was insufficient evidence that defendant suffered from any mental disease, defect, or disorder at the time of commission of the offense.

Defendant's request for CALJIC No. 3.32 flowed from the expert testimony given by Dr. Fred Rosenthal, which we have recounted above.

Following the evidentiary phase of the trial, defense counsel requested the court to instruct with CALJIC No. 3.32. Counsel believed there was evidence, specifically the testimony of Dr. Rosenthal, that could allow the jury to find defendant was suffering from a drug-induced psychosis at the time of the stabbing, and that such psychosis falls within the definition of mental defect or mental disease as set forth in CALJIC No. 3.32.

The prosecutor objected to the giving of the instruction, arguing that no evidence had been presented defendant was suffering from any psychosis or any bizarre thoughts before defendant carried out the stabbing. The prosecutor further argued Dr. Rosenthal's testimony about the generic ramifications for some people from smoking rock cocaine was not sufficient to allow the defense to bootstrap an instruction telling the jurors that they had received evidence that defendant in fact was suffering from a mental defect or mental disease. The People argued the real issue before the jury was whether defendant's voluntary intoxication was such as to impair his mental state, and that the appropriate CALJIC instruction (CALJIC No. 4.21.1—which addresses the issue of voluntary intoxication where relevant to mental state) should be given on that issue.

In denying defense counsel's request to instruct with CALJIC No. 3.32, the trial court noted there was an insufficient basis warranting the instruction. The court concluded instructions on voluntary intoxication were the only proper instructions to give, although it further indicated it would not limit counsel's right to comment on Dr. Rosenthal's testimony in closing argument. In fact, the trial court instructed on voluntary intoxication.[2]

CALJIC No. 3.32 is in the nature of a pinpoint instruction that is required to be given only on request where the evidence supports the defense theory.

---

[2]The jury was instructed with CALJIC No. 4.21.1 as follows:

"In the crime of attempted murder which the defendant is accused in Count One, a necessary element is the existence in the mind of the defendant of the specific intent to kill another human being.

"If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether defendant had the required specific intent. If, from all the evidence, you have a reasonable doubt whether the defendant formed that specific intent, you must find that he did not have such specific intent.

"It is also alleged in Count One that the crime attempted was willful, deliberate and premeditated murder. If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true.

"If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether the crime attempted was willful, deliberate and premeditated murder.

"Intoxication of a person is voluntary if it results in the willing use of any intoxicating liquor or any substance knowing that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect.

"Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug or other substance."

(*People v. Ervin* (2000) 22 Cal.4th 48, 91 [91 Cal.Rptr.2d 623, 990 P.2d 506].) Indeed, the general rule is that a trial court need give a requested instruction concerning a defense only if there is substantial evidence to support the defense. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

Defendant claims because he was suffering from a psychotic state induced by smoking a substantial amount of rock cocaine at the time he stabbed the victim, it was error for the trial court not to instruct with CALJIC No. 3.32. In support of this argument, defendant relies on *People v. Smithey* (1999) 20 Cal.4th 936 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (*Smithey*).

In *Smithey*, three defense experts examined and tested the defendant and concluded the defendant had organic brain damage, a generally diffused brain dysfunction, and mild mental retardation. In addition, the evidence at trial, which included a toxicology analysis of the defendant's blood, indicated the defendant was suffering from classic amphetamine-psychosis syndrome. The defendant also had amnesia with regard to the events on the day of the crime. The experts opined absent these disorders the defendant would not have committed the crime. In *Smithey*, the trial court instructed with CALJIC No. 3.32.

Defendant also relies on *People v. Aguilar* (1990) 218 Cal.App.3d 1556 [267 Cal.Rptr. 879] (*Aguilar*), disapproved on other grounds in *People v. Ervin, supra*, 22 Cal.4th at pages 90-91, which held the trial court erred in not instructing with former CALJIC No. 3.36 (current CALJIC No. 3.32). In *Aguilar*, defense psychology experts examined the defendant and reached specific conclusions regarding his mental state; specifically, the defendant suffered from paranoid personality traits which could have been caused or exacerbated by his cocaine use, and which would have impaired his judgment or caused him to overreact if he felt threatened. (*Aguilar, supra,* 218 Cal.App.3d at p. 1569.)

In contrast to the personal observations made by the experts in *Smithey* and *Aguilar*, in this case Dr. Rosenthal did not examine defendant. As a result, Dr. Rosenthal testified only as to the general effects rock cocaine may have on chronic users, and even then he admitted the effects can vary from person to person. Dr. Rosenthal did not examine, test, or evaluate defendant, nor did he opine defendant was suffering from a mental disease, mental defect, or mental disorder when defendant stabbed the victim.

Given the foregoing, the trial court did not err in refusing to instruct with CALJIC No. 3.32. "Mental illness [or mental defect] is a *medical* diagnosis

. . . ." (*People v. Kelly* (1992) 1 Cal.4th 495, 540 [3 Cal.Rptr.2d 677, 822 P.2d 385], italics added.) Expert medical testimony is necessary to establish a defendant suffered from a mental disease, mental defect, or mental disorder because jurors cannot make such a determination from common experience. (See *Conservatorship of Torres* (1986) 180 Cal.App.3d 1159, 1163 [226 Cal.Rptr. 142].)

The cases we have found that approve the giving of CALJIC No. 3.32 have all done so where expert medical testimony was adduced on the question of defendant's mental disease, etc. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1229-1230, 1247-1249 [74 Cal.Rptr.2d 212, 954 P.2d 475] [expert testimony defendant suffered from mental disease; trial court properly gave an instruction consistent with CALJIC No. 3.32]; *People v. Cox* (1990) 221 Cal.App.3d 980, 987 [270 Cal.Rptr. 730] [same]; *People v. Molina* (1988) 202 Cal.App.3d 1168, 1171 [249 Cal.Rptr. 273] [same]; *People v. Young* (1987) 189 Cal.App.3d 891, 907-909 [234 Cal.Rptr. 819] and fn. 6 [same].)

Defendant requested an instruction that would have stated to the jury that it had received evidence of a mental disease, mental defect, or mental disorder of the defendant at the time of the commission of the crime charged, *even though no such competent evidence was presented*. Without expert medical testimony establishing that defendant was suffering from a mental disease, defect, or disorder at the time of the commission of the crime, there was no evidentiary or legal basis for the trial court to instruct with CALJIC No. 3.32. (See *People v. Maxey* (1972) 28 Cal.App.3d 190, 199 [104 Cal.Rptr. 466] [no expert testimony as to defendant's "unsound mind"; compare *People v. Williams* (1971) 22 Cal.App.3d 34, 52 [99 Cal.Rptr. 103] [psychiatrists testified as to defendant's "abnormal brain, one even of his being insane, of his mind being temporarily gone"].)

In light of the evidence presented, defendant was entitled to instructions on voluntary intoxication and such instructions were given by the court. In our view, these instructions fully and properly allowed the jury to consider defendant's claimed intoxicated state at the time of the incident and whether, because of that state, defendant actually formed the specific intent to kill, or premeditated or deliberated his criminal conduct. (§ 28.)

The trial court correctly instructed on voluntary intoxication and correctly refused to instruct on mental disease, defect, or disorder with CALJIC No. 3.32.

## III.

██  Defendant argues it was error for the trial court to instruct the jury to deliberate further on count one, attempted murder that was willful, premeditated, and deliberate. The trial court's instruction followed a note by the jurors that informed the court they were deadlocked on the charge. As we explain, the challenged instruction did not exert pressure on the jurors as a whole to reach a verdict.

Jury deliberations began on the morning of August 24, 2000. The jury continued to deliberate through the afternoon and recessed after requesting defendant's testimony to be reread. On the morning of August 25, 2000, the jury advised the court in writing that they were able to reach a verdict on count two, but could not reach a unanimous vote on count one.

In response, and over a defense objection, the court directed the jury to deliberate further as to count one, reading them the following instruction:

"What I am going to do right now, ladies and gentlemen, is I have further instructions and directions to give you as to Count One. . . .

"It has been my experience on more than one occasion that a jury which initially reported it was unable to reach a verdict was ultimately able to arrive at verdicts on one or more of the counts before it. To assist you in your further deliberations, I'm going to further instruct you as follows:

"Your goal as jurors should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs. You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong.

"Fair and effective jury deliberations require a frank and forthright exchange of views.

"As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration

of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.

"Both the People and the defendant are entitled to the individual judgment of each juror.

"As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate. May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen, that you consider to change the methods you have been following, at least temporarily and try new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the other's positions.

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations. I merely find you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you reread CALJIC instruction 1.00 on page 1 and 1-A, CALJIC instruction 17.40 on page 40, and CALJIC instruction 17.41 on page 41. These instructions pertain to your duties as jurors and make recommendations on how you should deliberate.

"The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions. CALJIC instruction 1.00 defines the duties of a juror.

"The decision the jury renders must be based on the fact[s] and the law. You must determine what facts have been proved from the evidence received in the trial and not from any other source. A fact is something proved by the evidence or by stipulation.

"Second, you must apply the law I state to you to the facts as you determine them and in this way, arrive at your verdict.

"You must accept and follow the law as I state it to you regardless of whether you agree with the law. If anything concerning the law said by the

attorneys in their arguments or at any other time during the trial conflict[s] with my instructions on the law, you must follow my instructions.

"CALJIC 17.40 defines the jury's duty to deliberate. The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court. These are the matters this instruction requires you to discuss for the purpose of reaching a verdict.

"CALJIC 17.41 is an instruction which recommends how jurors should approach their task.

"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to you. I hope my comments and suggestions may have some assistance to you.

"You're ordered to continue your deliberations at this time. If you have other questions, concerns, requests or any communications you desire to report to me, please put those in writing on the form my bailiff has provided you with. Have them signed and dated by your foreperson and then please notify the bailiff."

Following the trial court's additional instruction, the jury recessed for the weekend following the afternoon of August 25, 2000, and returned on the morning of August 28, 2000, when a verdict of guilty was reached on count one after two additional hours of deliberation.

Defendant argues the trial court's instruction was coercive, particularly when considered in context with the alleged erroneous decision not to instruct with CALJIC No. 3.32. Defendant argues such charge to the jury was improper.

In *Allen v. United States* (1896) 164 U.S. 492, 501-502 [17 S.Ct. 154, 157, 41 L.Ed. 528, 531], the Supreme Court approved a charge (the *Allen* charge) which encouraged the minority jurors to reexamine their views in light of the views expressed by the majority, noting that a jury should consider that the case must at some time be decided. In *People v. Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73], however, our state high court disapproved of *Allen* in two respects. The *Gainer* court found "the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views" was improper, inasmuch as, by counseling minority jurors to consider the majority view, whatever it might be, the instruction encouraged jurors to abandon a focus on the evidence as

the basis of their verdict. (*Gainer*, at pp. 845, 848.) The second issue with which the *Gainer* court took issue was the direction the jury " 'should consider that the case must at some time be decided,' " noting such a statement was inaccurate because of the possibility the case might not be retried. (*Id.* at pp. 851-852.) In other words, it is improper to instruct the jury in language that suggests that if the jury fails to reach a verdict the case necessarily will be retried. (*Ibid.*)

The trial court's additional instruction in this case did not constitute an improper *Allen* charge. The trial court did not direct the jurors that "the case must at some time be decided." To the contrary, the court instructed that the "goal as jurors should be to reach a fair and impartial verdict *if you are able to do so* based solely on the evidence presented and without regard to the consequences of your verdict [or] regardless of how long it takes to do so." (Italics added.) Nothing in the trial court's charge was designed to coerce the jury into returning a verdict. (*People v. Miller* (1990) 50 Cal.3d 954, 994 [269 Cal.Rptr. 492, 790 P.2d 1289].) Instead, the charge simply reminded the jurors of their duty to attempt to reach an accommodation.

Additionally, the court directed the jurors to consider carefully, weigh and evaluate all of the evidence presented at trial, to discuss their views, and to consider the views of their fellow jurors. Finally, the court instructed that it was their duty as jurors to deliberate with the goal of arriving at a verdict on the charge *"if you can do so without violence to your individual judgment."* (Italics added.)

Contrary to defendant's argument on appeal, the jury was never directed that it was required to reach a verdict, nor were any constraints placed on any individual juror's responsibility to weigh and consider all the evidence presented at trial. The trial court also made no remarks either urging a verdict be reached or indicating possible reprisals for failure to reach an agreement. In short, it is clear the trial court took great care in exercising its power "without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency. . . . Nothing in the trial court's comment in the present case properly may be construed as an attempt to pressure the jury to reach a verdict . . . ." (*People v. Proctor* (1992) 4 Cal.4th 499, 539 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

Defendant criticizes the trial court for not ascertaining whether there was a reasonable probability the jurors could agree on a verdict before giving them additional instructions. However, section 1140 vests the trial court with discretion to determine whether there is a reasonable probability of agreement among jurors who have reported an impasse. (*People v. Proctor, supra,*

4 Cal.4th at p. 539; *People v. Carter* (1968) 68 Cal.2d 810, 815-816 [69 Cal.Rptr. 297, 442 P.2d 353].) In this case, and presumably because of the relatively brief duration of deliberations conducted by the jurors before they announced they could not reach a verdict on count one, the trial court concluded further deliberations might be beneficial without questioning the jury regarding the impasse. The fact the jury was able to reach a verdict relatively quickly after being further instructed reflects the court properly exercised its discretion.

The trial court did not err in giving the challenged instruction. Indeed, the trial judge (Judge Michael G. Virga) should be commended for fashioning such an excellent instruction.

DISPOSITION

The judgment is affirmed.

Davis, J., and Callahan, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 15, 2002.