Filed 1/30/14  P. v. Tran CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C067416 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F00911) |
| v. | |
| TUAN HUY TRAN, | |
| Defendant and Appellant. | |

A jury found defendant Tuan Huy Tran guilty on one count of sexual penetration by a foreign object of an unconscious victim.  On appeal, defendant contends:  (1) the trial court erred by denying the defense motion to dismiss or to impose sanctions against the prosecution for destroying material evidence; (2) the trial court erred by dismissing Juror No. 2 and Juror No. 8 for misconduct; and (3) the trial court abused its discretion by denying the first and second motions for mistrial based on the jury's failure to reach a verdict.  As none of the contentions has merit, we affirm.

1

FACTS

On the evening of January 31, 2009, victim Christina and her friend, Phong Le, went to a house party in Elk Grove at the residence of defendant Tuan Huy Tran. Christina had never met defendant before and had never been to his house. Phong was the only person Christina knew at the party. Shortly after arriving at the party, Christina began consuming large amounts of vodka and beer. She soon became intoxicated and nauseated. Christina went into the bathroom and threw up in the toilet and bathtub for about one hour. Afterwards, because she was still intoxicated, dizzy, and tired, she went into a bedroom, lay down on a bed, got under the covers, and fell asleep.

After sleeping for about two hours, Christina awoke to see her brother James and Phong Le in the bedroom with her. James and Phong attempted to get her out of bed to take her home, but she refused. Christina appeared irritated, did not want to move, and just wanted to sleep. Unable to walk very well on her own, she refused an offer to be carried out of the bedroom by James and Phong. James and Phong decided to return for her the next morning, and Christina lay back down on the bed and went to sleep. James and Phong returned to Phong's house in West Sacramento.

After sleeping for approximately one hour after James and Phong left, Christina woke up to find defendant's hand down her pants and his finger in her vagina. She did not consent to this touching. Christina immediately pushed defendant away and moved away from him. Defendant then grabbed Christina's hand and placed it on his semierect penis, but Christina pulled her hand back. At about the same time, another partygoer, Mary, who was looking for playing cards, pushed open the partially closed door and called out defendant's name multiple times. Defendant got up out of bed and left the bedroom.

Christina then left the bedroom, called her brother James, and explained to him what had happened. She sounded flustered and was crying. James told Christina that he would come and get her, and then he called the police. Christina waited outside the

2

house for her brother to arrive. While outside she was approached by Lam Dao, a good friend of defendant, and she explained to him what had happened. Lam took Christina back inside the house to wait for James. While waiting inside the house, defendant approached Christina and asked her if she was okay. Christina responded, "Yeah."

Shortly thereafter, officers arrived on scene, and Christina explained what had happened. She identified defendant as the perpetrator. Defendant was arrested and transported to the police station for questioning by Officer Joerg Schwarzenberg.

## PROCEDURE

The district attorney charged defendant by information with one count of sexual penetration by a foreign object of an unconscious victim. (Pen. Code, § 289, subd. (d).) A jury found defendant guilty as charged. The trial court (1) suspended imposition of sentence and placed defendant on five years' probation on condition he serve 365 days in jail and (2) ordered defendant to register as a sex offender. (Pen. Code, § 290.) Defendant appeals.

## DISCUSSION

## I

### *Motion to Dismiss or Sanctions for Destruction of Evidence*

Defendant contends that the trial court erred by denying the defense motion to dismiss or to impose sanctions against the prosecution for destruction of material evidence. The contention is without merit.

A.    *Relevant Procedure*

During trial, defense counsel filed a motion to dismiss or, in the alternative, to impose lesser sanctions based on a claim that the prosecution had destroyed exculpatory material evidence in bad faith, in violation of *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413] (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 [102 L.Ed.2d 281] (*Youngblood*). The motion was based on Officer Winston Gin's actions when defendant was being interrogated. Officer Gin disposed of the cotton swabs after

3

he used them on defendant's hands as a ruse to get defendant to believe he was collecting DNA evidence.

Officer Gin testified at the evidentiary hearing that he decided to use a ruse in an attempt to get the defendant to confess. He took some gauze and swabs from the police department's medicine cabinet and found a manila envelope from somewhere, with the intention of pretending to collect DNA evidence. He then took defendant's hand and swabbed each finger with a different cotton swab. On cross-examination, Officer Gin was asked whether he put each swab into a separate manila envelope, and he replied that he could not remember. While swabbing defendant's fingers, Officer Gin told defendant, "I'm going to be swabbing each of your fingers. The person's DNA is going to be left and if you're truly innocent, then there won't be any of her DNA on your fingers. Correct? [¶] . . . [¶] And if we do find DNA . . . then it's going to show that you're a liar and that she's telling the truth. Correct?" Officer Gin encouraged the defendant to tell the truth. During the ruse, defendant did not make an incriminating statement.

Officer Gin never intended to collect DNA from the defendant, but rather intended to trick him into confessing. He had never received training in the collection of DNA evidence, and had never personally collected DNA. He did not believe the swabs had evidentiary value, so he threw the cotton swabs and envelope in the trash.

Marc Taylor testified at the hearing for the defense as an expert in the transfer and collection of DNA. He testified that he would expect to detect the presence of DNA on a person's finger if that person had inserted his finger into a vagina and had not washed his hands afterwards. The amount of DNA present would depend on how vigorously the finger was wiped afterwards and whether any secretions had dried. Taylor stated that using a wet swab would be more efficient in the collection of DNA than a dry swab. He further testified that he would expect to find a transfer of DNA despite not using a rape kit.

4

Defendant testified at the hearing that he did not wash or wipe his hands during the time period between the incident and the police interrogation.

The trial court denied defendant's motion to dismiss, holding that the defense failed to show that the discarded swabs had apparent exculpatory value at the time of destruction, as required under *Trombetta*, and that there was no bad faith, under *Youngblood*.

B.      *Analysis*

Defendant contends that the trial court erred by denying the defense motion to dismiss.  He claims that Officer Gin destroyed material evidence that would have benefited the defense.  Defendant argues that:  (1) the prosecution had a duty to preserve the swabs as material exculpatory evidence, and (2) the swabs were discarded in bad faith.

In *Trombetta*, the court stated:  "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality [citation], evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  (*Trombetta, supra*, 467 U.S. at pp. 488-489, fn. omitted.)  Defendant claims that the exculpatory value of the swabs was apparent at the time of the investigation because if the swabs did not contain the victim's DNA, then the defendant might be telling the truth.  Defendant, however, wants us to assume there was no DNA on the swabs.  Without further testing, it is impossible to know whether there was or was not DNA evidence on the swabs.  Since it is impossible to know without testing whether there was DNA evidence on the swabs, we cannot logically assume now that the evidence was exculpatory.

Defendant further claims that the trial court erred when it failed to inform the jury that, had the swabs been retained, the swabs would have lacked the victim's DNA taken

from defendant's fingers. Again, defendant wants us to assume there was no DNA on the swabs. Since the swabs were discarded by Officer Gin and were never tested, it is impossible for this court to determine wither DNA evidence was or was not on the swabs. Therefore, the exculpatory value of the swabs was not apparent before the evidence was discarded. Since we hold that the exculpatory value was not apparent, we need not decide the second prong in *Trombetta*, whether the evidence is "of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra*, 467 U.S. at p. 489.)

As stated in *Youngblood*, the defendant must show bad faith on the part of the police if the exculpatory value of the evidence is not apparent. "[R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Youngblood*, *supra*, 488 U.S. at p. 58.)

The court stated in a footnote: "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. [Citation.]" (*Youngblood, supra*, 488 U.S. at p. 56, fn. * [102 L.Ed.2d at p. 288].) Officer Gin testified that at the time he threw away the cotton swabs, he believed the swabs were of no evidentiary value. The swabbing of the fingers began as a ruse, as is evidenced by the haphazard collection of material from the police first aid kit. Once the ruse failed to elicit an incriminating response from defendant, Officer Gin discarded the swabs. The cotton swabs had no apparent exculpatory value to Officer Gin when he discarded them. Defendant merely speculates that, had the cotton swabs been preserved and tested, the

6

victim's DNA would not have been found on them. That speculation does not support a finding of bad faith.

Although the cotton swabs were discarded intentionally, there is no evidence that they were discarded in bad faith. Therefore, the trial court did not err by denying defendant's motion to dismiss or to impose sanctions against the prosecution for destroying material evidence.

## II

### *Dismissal of Jurors*

Defendant contends that the trial court erred by dismissing Juror No. 2 and Juror No 8 for misconduct. Defendant claims that the jurors' inability to perform as jurors was not shown as a "demonstrable reality." The contention is without merit.

A.    *Applicable Law*

A defendant has a constitutional right to a unanimous verdict by a fair and impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; see also *People v. Engelman* (2002) 28 Cal.4th 436, 442.) Consistent with this constitutional right, a trial court may discharge a sworn juror under some circumstances. Penal Code section 1089 states in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

"Removing a juror is, of course, a serious matter, implicating the constitutional protections defendant invokes. While a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with great care." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted (*Barnwell*).) "When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is

7

*required*.  [Citations.]"  (*Id*. at p. 1051, original italics.)  "A trial court facilitates review when it expressly sets out its analysis of the evidence, why it reposed greater weight on some part of it and less on another, and the basis of its ultimate conclusion that a juror was failing to follow the oath."  (*Id*. at p. 1053.)

A trial court's decision to remove a juror is reviewed under an abuse of discretion standard and will be upheld only if that juror's disqualification appears on the record as a demonstrable reality.  (*People v. Wilson* (2008) 43 Cal.4th 1, 26 (*Wilson I*).)  "A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct."  (*People v. Wilson* (2008) 44 Cal.4th 758, 823-824 (*Wilson II*).)

"The demonstrable reality test entails a more comprehensive and less deferential review.  It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.  It is important to make clear that a reviewing court does not *reweigh* the evidence under either test.  Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied."  (*Barnwell, supra*, 41 Cal.4th at pp. 1052-1053, original italics.)  We consider the evidence on which the trial court relied, and the trial court's express statement of reasons, affording deference to the trial court's firsthand observations and credibility determinations.  (*Id.* at pp. 1052-1053.)

Courts are prohibited from reviewing jurors' mental processes.  Evidence Code section 1150, subdivision (a) states:  "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental

8

processes by which it was determined." However, "[b]y its very language, this section applies only to postverdict inquiries into how error or misconduct had affected the juror in reaching the verdict. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 838.)

The court in *People v. Cleveland* (2001) 25 Cal.4th 466 (*Cleveland*) stated: "Many of the policy considerations underlying the rule prohibiting post-verdict inquiries into the jurors' mental processes apply even more strongly when such inquiries are conducted during deliberations." (*Id*. at p. 476.) The court noted that the "need to protect the sanctity of jury deliberations, however, does not preclude reasonable inquiry by the court into allegations of misconduct during deliberations." (*Ibid*.) The court went on to state: "Although the provisions of Evidence Code section 1150 apply only to the postverdict situation and not to an inquiry conducted during jury deliberations, [many cases] support our conclusion that a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

B. *Dismissal of Juror No. 2*

At the beginning of trial and again at the conclusion of evidence, the trial court instructed the jury in relevant part: "Do not let bias, sympathy, prejudice, or public opinion influence your decision in any way. You must reach your verdict without any consideration of punishment."

After approximately four days of deliberation, Juror No. 5 prepared a note claiming that Juror No. 2 had prejudged the case and was focused on the punishment rather than the evidence, in violation of the trial court's orders. Juror No. 5 sent the note to the trial court expressing the concerned view of some jurors:

"Your Honor. [¶] It is a concern of multiple jurors that one juror may not be keeping an open mind regarding the deliberation discussion and your previous direction.

9

"It is a concern that this juror is considering what we 'don't have' or 'haven't been presented with' to make his decision instead of following your instructions provided yesterday (Monday 9/27/10).

"In addition it is our concern that this juror is focusing on the consequence, label and punishment in which the defendant may recieve [*sic*] if found guilty of the felony charge, and has stated as such. We also feel that he entered the deliberation with his mind made up and not keeping an open mind.

"Please provide direction as to if this is acceptable. We feel that we have made progress with our discussion but also feel that because of the above stated we cannot progress any further.

Thank you:

[Juror No. 5]"

The trial court examined Juror No. 5 on the record. Juror No. 5 explained that Juror No. 2 had repeatedly stated that the defendant would be forever labeled a "sexual freak," and believed that Juror No. 2 had entered deliberations with his mind already made up. Juror No. 5 believed that Juror No. 2 was focused on the punishment and had never discussed the case with an open mind.

Other jurors were then questioned by the court on the record. Juror No. 1 also believed that Juror No. 2 was focusing on the consequence, label, and punishment in violation of the court's order. Juror No. 1 testified that Juror No. 2 had stated on multiple occasions, including the first day of deliberation, that he refused to label someone a sex offender and have him go through the rest of his life with that label. Juror No. 1 also testified that on the first morning of deliberations, Juror No. 2 stated that his mind was made up and that he had not seen enough evidence to change his mind.

Juror Nos. 3, 4, 6, and 7 told the trial court that they believed Juror No. 2 had been focused on the consequences, label, and punishment and had his mind already made up. Juror Nos. 3 and 4 confirmed that Juror No. 2 used the label "sexual freak" or "sex freak"

10

multiple times. Juror No. 9 believed that Juror No. 2 had entered deliberations with his mind already made up.

The trial court then questioned Juror No. 2 on the record. Juror No. 2 admitted using the term "sexual freak" during jury deliberations. When the trial court asked Juror No. 2 if he had focused on the consequence, label, and punishment, Juror No. 2 repeated the court's question. When the trial court told Juror No. 2 that the question called for a "yes" or "no" answer, Juror No. 2 denied focusing on punishment only. Juror No. 2 denied that his mind was made up when he entered the jury deliberation room.

After arguments from both sides, the trial court stated in relevant part: "Well, I would like the record to reflect that I did find [Juror No. 2's] demeanor to be quite different from the way it was during voir dire. [¶] During the voir dire, he responded to questions very directly. He was not equivocal. He was engaging. . . . [¶] When he was just in here, his responses were quite different. He at times responded to the Court's questions by saying 'I may have,' 'I am not sure,' 'I don't know.' And I did not find him to be direct in responding to the Court's question about his using the label 'sexual freak.' [¶] And then to have him define what sexual freak means to him, to say that it is referring to someone, not what a normal person does in bed. Well, how in the world does that have anything to do with this case? Not what a normal person does in bed. [¶] The proof is from these jurors who heard him use that label on more than one occasion, and it appears from their testimony at least three times. [¶] . . . [¶] I feel that testimony impeaches [Juror No. 2]. [¶] . . . [¶] I do believe that [Juror No. 2] has violated the Court's instructions on numerous occasions, and I do find that he was not forthright in responding to the Court's questions this afternoon. And given his misconduct, I am going to excuse him from this jury."

Defendant claims that the trial court erred in dismissing Juror No. 2 because the record does not support, by a "demonstrable reality," the removal of the juror. We disagree.

11

Juror No. 2 violated the trial court's instructions by focusing on the consequence, label, and punishment rather than on the evidence. Juror No. 5's note written to the trial court along with the testimony of Juror Nos. 1, 3, 4, 5, 6, and 7 establish that Juror No. 2 was impermissibly focused on the label and consequences of a guilty verdict. On multiple occasions during deliberations, Juror No. 2 stated that he refused to label the defendant a "sexual freak" without DNA evidence. And Juror No. 2 admitted using the term "sexual freak." Based on this evidence, the trial court concluded that Juror No. 2 had violated its instruction not to consider punishment.

Defendant cites *Wilson II*, *supra*, 44 Cal.4th 758 for the proposition that jurors are allowed to use their personal experience and observations to fill in the blanks in the evidence. However, this is not a juror filling in the blanks with his personal experiences because he admittedly was focused on matters the trial court instructed him not to focus on.

Multiple jurors testified that Juror No. 2 made numerous statements during deliberations such as: " '[defendant will] be known as a sexual freak' "; and " 'I am not gonna label somebody a sex offender and have him go through the rest of his life with that label' "; and " 'sex freak' "; and " 'sexual predator.' " Therefore, it was a "reasonable inquiry" for the trial court to determine whether Juror No. 2 had committed misconduct, and the inquiry was "limited in scope" to these statements. (*Cleveland*, *supra*, 25 Cal.4th at pp. 476, 485.) There was a demonstrable reality that Juror No. 2 focused on the consequence, label, and punishment and repeatedly, even expressively, violated the trial court's instructions. Therefore, the trial court did not err when it dismissed Juror No. 2 for misconduct.

C.    *Dismissal of Juror No. 8*

During jury selection, defense counsel asked prospective jurors, apparently those seated in the jury box: "Is there anybody here who's been falsely accused of something? And I don't just mean married people who have been falsely accused by their spouse,

12

something semi-serious, maybe a crime.  Nobody?  [¶]  Have you ever had to defend yourself against an accusation?  Nobody?  Not even the teachers?"  After these questions, one of the prospective jurors mentioned that he had been accused of things he did not do with respect to construction arbitrations.  The prospective juror said that he would feel "put upon" if he was falsely accused of the things involved in this case.

Later when Juror No. 8 was in the jury box, defense counsel said:  "I'm going to obviously try to pare down the number of questions I asked.  Everybody here, I'm sure, heard my line of questioning with all of the potential jurors.  [¶]  Just off the bat, is there anything that you want to raise your hand about that you – I think you got a sense of what I'm looking for, what I'm concerned about.  [¶]  Is there anybody who feels there's something they should say right off the bat?"

Well into deliberations, two days after Juror No. 2 was dismissed, the jury reported to the trial court that they were " 'locked in a[t] 11-1.  The "1" has stated they will not change mind, based on evidence provided.' "  The trial court urged further deliberations and surveyed the jury to determine whether further measures would help the jury reach a verdict.  In response to the survey, the holdout juror, Juror No. 8 sent a note to the trial court, " 'Your Honor, May I please speak to you about some concerns about deliberations.  Thank you.  Juror [No.] 8.' "

Juror No. 3 also wrote a note to the trial court which stated:  " 'Your Honor, [i]t was revealed to us today that one of our jury members has had the experience of being falsely accused of sexual harassment by a female co-worker.  His demeanor during his description of the incident causes me to doubt his openness to witness testimony.  He has also stated that he feels that the witness is to blame (for being drunk) at least in part, but my main concern is that his previous experience has influenced his ability to follow all of your instructions.  Thank you, Juror [No.] 3.' "

The trial court first examined Juror No. 1 on the record.  Juror No. 1 stated that Juror No. 8 revealed that he had been falsely accused of sexual harassment and, because

13

of that, Juror No. 8 was having a difficult time finding defendant guilty. Juror No. 8 further stated in deliberations that he was suspended from work for two weeks, without pay, while the matter was being investigated.

The trial court then questioned Juror No. 8. He admitted that a sexual harassment claim had been made against him at work five or six years earlier. Juror No. 8 acknowledged that he had discussed this sexual harassment claim with other jurors, but claimed that he did not remember being asked a question during jury voir dire regarding false accusations or allegations. Juror No. 8 claimed to be unaware that this information would have been responsive to questions asked during jury selection.

The trial court reviewed the record of voir dire and the specific questions asked regarding prior experiences before it made its decision to dismiss Juror No. 8. Following oral arguments by the parties, the trial court ruled that Juror No. 8 had failed to disclose responsive information and had intentionally concealed that he had been falsely accused of sexual harassment.

The trial court stated: "The Court's ruling is as follows: [Juror No. 8] failed to disclose responsive information. He concealed that he had been falsely accused of sexual harassment. [¶] It is clear from reviewing the transcripts that false allegations, especially of a sexual nature, were responsive and should have been disclosed during the voir dire process. [¶] I have read the transcript. I have considered [Juror No. 8's] demeanor and his answers in court on Thursday. I have also considered whether [Juror No. 8's] nondisclosure was merely inadvertent or unintentional.

"I have read the points and authorities and look particularly to the cases cited by [defense counsel]: *People versus McPeters* at 2 Cal.4th 1148 (1992) and *People versus Cleveland*.

"(As read:) A juror's intentional concealment of relevant facts or of giving false answers during the voir dire examination constitutes misconduct and raises a presumption of prejudice. (End of reading.) [¶] . . . [¶]

14

"Here, there is substantial evidence that [Juror No. 8] committed misconduct during voir dire. Counsel asked the panel of prospective jurors whether anyone had ever been falsely accused of something semiserious like a crime and had to defend themselves against that accusation. [¶] Juror [No. 8] was in the room and presumably heard the question. [¶] Later, after [Juror No. 8] was seated in the jury box for voir dire, the Court asked:

"(As read:) So let me ask, have any of you or has any member of your family or close friend to your knowledge ever been investigated for, arrested for or charged with a crime involving alleged unlawful touching of any kind? If so, please raise your hand. [¶] (End of reading.)

"Juror [No. 8] did not respond. He was subsequently sworn in as a juror. [¶] . . . [¶] When [Juror No. 8] denied remembering being asked about false accusations during voir dire given the nature of the charges and the questions posed during voir dire, the juror's denial was not credible.

"I find that [Juror No. 8] did intentionally conceal the fact that he had previously been falsely accused of sexual harassment which constituted misconduct and gives rise to a presumption of prejudice.

"There is no evidence either presented by the parties or after the Court's own review of the record to show that the misconduct has not or could not likely cause actual harm.

"To the contrary, there is affirmative evidence that the misconduct has caused actual harm in that [Juror No. 8's] prior experience has prevented him from being fair and impartial to both parties.

"Good cause appearing that [Juror No. 8] is unable to perform his duty, he is therefore discharged and he will be replaced with an alternate juror."

Defendant contends that Juror No. 8 should not have been dismissed because his failure to mention a sexual harassment allegation in jury voir dire was not nonresponsive

15

to questioning about allegations of criminal or serious sexual misconduct. Defendant states that the court's voir dire question had to do only with an allegation of criminal "unlawful touching" and therefore, because the sexual harassment allegation was a civil matter, involving workplace verbal sexual harassment only, defendant contends that it would not be reasonable for a person to believe that it called for a response under the circumstances. We disagree.

The trial court held that Juror No. 8 had intentionally concealed relevant facts during voir dire. A juror who concealed relevant facts or gave false answers during jury voir dire, may have committed misconduct, and may be dismissed. (*Wilson II*, *supra*, 44 Cal.4th at pp. 823-824.)

In reviewing the record, we find that the trial court did not abuse its discretion. During voir dire, defense counsel asked if anyone had been falsely accused of anything and had to defend against those false accusations. Although Juror No. 8 was not in the box at the time, later, when Juror No. 8 was in the box, defense counsel asked if anyone had any answers for her prior questions. That clearly related to, among other things, counsel's questions about having been falsely accused and having to defend against those accusations. The trial court validly concluded that Juror No. 8 had intentionally concealed this information.

We agree with the trial court that Juror No. 8's misconduct was shown by a demonstrable reality, and therefore, the trial court did not err by dismissing Juror No. 8 for misconduct.

### III

### *Motions for Mistrial*

During trial, at two separate times, defense counsel moved for mistrial. Both motions were denied. On appeal, defendant argues that the trial court abused its discretion by denying each motion for mistrial. Defendant also argues that the trial court's supplemental jury instructions sentenced the jury to "indefinite deliberations,"

16

and that the trial court delivered an impermissible *Allen*-type or "dynamite" jury instruction rather than a permissible "firecracker" jury instruction. (*Allen v. United States* (1896) 164 U.S. 492, 501-502 [41 L.Ed. 528, 531]). We disagree with the defendant's view of the instructions.

A. *Applicable Law*

We approved the so-called "firecracker" jury instruction in *People v. Moore* (2002) 96 Cal.App.4th 1105, 1118-1122 (*Moore*) to direct the jury to continue deliberations in an effort to reach a verdict. We stated: "In [*Allen*], the Supreme Court approved a charge (the *Allen* charge) which encouraged the minority jurors to reexamine their views in light of the views expressed by the majority, noting that a jury should consider that the case must at some time be decided. In *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), however, our state high court disapproved of *Allen* in two respects. The *Gainer* court found 'the discriminatory admonition directed to minority jurors to rethink their position in light of the majority's views' was improper, inasmuch as, by counseling minority jurors to consider the majority view, whatever it might be, the instruction encouraged jurors to abandon a focus on the evidence as the basis of their verdict. (*Gainer*, at pp. 845, 848.) The second issue with which the *Gainer* court took issue was the direction the jury ' "should consider that the case must at some time be decided," ' noting such a statement was inaccurate because of the possibility the case might not be retried. (*Id*. at pp. 851-852.) In other words, it is improper to instruct the jury in language that suggests that if the jury fails to reach a verdict the case necessarily will be retried. (*Ibid*.)" (*Moore, supra,* 96 Cal.App.4th at pp. 1120-1121; see also *People v. Remiro* (1979) 89 Cal.App.3d 809, 817-820.)

In *Moore*, we held that the "firecracker" instruction was a valid instruction because "[t]he trial court did not direct the jurors that 'the case must at some time be decided.' " (*Moore, supra*, 96 Cal.App.4th at p. 1121.) Instead, the trial court "instructed that the 'goal as jurors should be to reach a fair and impartial verdict *if you*

17

*are able to do so* based solely on the evidence presented and without regard to the consequences of your verdict [or] regardless of how long it takes to do so.' " (*Ibid.*, original italics.) We continued: "Nothing in the trial court's charge was designed to coerce the jury into returning a verdict. [Citations.] Instead, the charge simply reminded the jurors of their duty to attempt to reach an accommodation. [¶] Additionally, the court directed the jurors to consider carefully, weigh and evaluate all of the evidence presented at trial, to discuss their views, and to consider the views of their fellow jurors. Finally, the court instructed that it was their duty as jurors to deliberate with the goal of arriving at a verdict on the charge '*if you can do so without violence to your individual judgment.*' " (*Moore*, *supra*, 96 Cal.App.4th at p. 1121, original italics.)

B.     *First Motion for Mistrial*

On the second day of deliberation, the jury requested suggestions from the trial court stating that the jury had voted and that the votes were split. In response, the trial court surveyed the jury for a numerical breakdown of those votes. According to the jury, the first vote was three to nine and the third vote was six to six. The trial court ordered the jury to continue deliberating since the majority of time spent deliberating, up to this point, dealt with the read back of trial testimony. After deliberating less than two additional days, the jury advised the trial court that they were holding firm at 10 to two. Defendant made a motion for mistrial based on the jury's failure to reach a verdict. The prosecution requested that the trial court give the "firecracker" instruction, and over defendant's objection, the trial court did so.

The trial court delivered the "firecracker" instruction stating: "It has been my experience on more than one occasion that a jury, which initially reported that it was unable to reach a verdict, was ultimately able to arrive at a verdict. To assist you in your further deliberations, I am going to instruct you further as follows:

18

"Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented and without regard for the consequences of your verdict, regardless of how long it takes to do so.

"It is your duty as jurors to carefully consider, weigh, and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine theirs. You should not hesitate to change a view you once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong. Fair and effective jury deliberations require a frank and forthright exchange of views.

"As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors.

"It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge, if you can do so without violence to your individual judgment.

"Both the People and the defendant are entitled to the individual judgment of each juror. As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate. May I suggest, however, that since you have not been able to arrive at a verdict using the methods you have chosen, that you consider changing the methods you have been following, at least temporarily, and try new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the other's positions.

19

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations.  I merely believe you might find it productive to do whatever is necessary to ensure that each juror has a full and fair opportunity to express his or her views and to consider and understand the views of the other jurors.

"I also suggest you re-read instructions 200, 220, and 3550.  These instructions pertain to your duties as jurors and make recommendations on how you should deliberate and to the burden of proof.  The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions.

"Instruction 200 defines the duties of a juror.  The decision the jury renders must be based on the facts and the law. You must determine what facts have been proved from the evidence received in the trial and not from any other source.  A 'fact' is something proved by the evidence or by stipulation.

"Second, you must apply the law I state to you to the facts as you determine them, and in this way arrive at your verdict.

"You must accept and follow the law as I state it to you regardless of whether you agree with the law. If anything concerning the law said by the attorneys in their arguments, or at any other time during the trial, conflicts with my instructions on the law, including the instruction I am now giving you, you must follow my instructions.

"Instruction 3550 defines the jury's duty to deliberate.

"The decisions you make in this case must be based on the evidence and the stipulations received in the trial and the instructions given by the Court. These are matters this instruction requires you to discuss for the purpose of reaching a verdict.  This instruction recommends how jurors should approach their tasks.  You should keep in mind the recommendation this instruction suggests when considering the additional instructions, comments, and suggestions I have made in the instructions now presented to you.

"Instruction 220 defines proof beyond a reasonable doubt.

"I hope that these comments and suggestions may be of some assistance to you. You're ordered to continue on with your deliberations at this time. If you have other questions, concerns, requests, or any communications you desire to report to me, please put those in writing, have them signed and dated by your foreperson or by one of you, and please notify the bailiff. Thank you."

Defendant contends the trial court's supplemental jury instruction to continue deliberating, displaced the independent judgment of the jury. Defendant argues that the court "effectively delivered an *Allen*-type instruction in this case." The record does not support this. To the contrary, the trial court gave the approved "firecracker" instruction from *Moore* effectively verbatim. Just as the trial court in *Moore* instructed the jury, the trial court here instructed: "Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented and without regard for the consequences of your verdict, regardless of how long it takes to do so." Nothing in the trial court's charge coerced the jury to return a verdict. Since the trial court delivered the "firecracker" instruction approved in *Moore*, we hold that the trial court did not abuse its discretion by denying the first motion for mistrial.

C.    *Second Motion for Mistrial*

After the trial court removed Juror No. 2 for misconduct and a replacement was sworn in, the court instructed the jury to begin their deliberations anew. The next day the jury sent a note stating it was " 'locked in a[t] 11-1.' " The court surveyed the jury to determine what if anything, would help the jury reach a verdict. The trial court eventually removed Juror No. 8 for misconduct as discussed above. Defendant made a second motion for mistrial, which was denied. After another alternate juror was sworn in, the court instructed the jury to begin their deliberations anew, and a verdict was reached later that afternoon.

On appeal, defendant argues that the trial court erred by denying the second motion for mistrial based on the jury's inability to reach a verdict. However, as the record reflects, defendant's second motion for mistrial at trial was not based on the jury's failure to reach a verdict. To the contrary, defense counsel's motion for mistrial was based on the trial court's ruling that Juror No. 8 had committed misconduct. At trial, defense counsel stated: "And given the Court's ruling that [Juror No. 8] has basically caused a trial that has been unfair and partial to both parties, at this time I would move for a mistrial. [¶] It is my position that if the Court finds [Juror No. 8] has engaged in such misconduct, this goes to the heart of the trial itself, not just to one side or the other. And given that [defendant] has that fundamental right to a fair trial and that this alleged juror misconduct has appeared to have wreaked havoc in the juror deliberation room, it has so affected the jury deliberation process that a mistrial must be declared."

An issue on appeal is forfeited by the failure to make a timely objection on the same grounds in the trial court. (*In re Seaton* (2004) 34 Cal.4th 193, 198.) Although defendant made a timely second motion for mistrial in the trial court, his contention on appeal raises a different issue. In the trial court, defendant claimed the misconduct of [Juror No. 8] tainted the trial, but on appeal he claims deliberations were allowed to continue for too long. That contention on appeal is forfeited because it was not raised in support of the second motion for mistrial.

In any event, the contention is without merit. Although deliberations had gone on for several days, it was reasonable to have deliberations continue to verdict, as they did not long after the juror who committed misconduct was excused. (See *People v. Bell* (2007) 40 Cal.4th 582, 616.)

DISPOSITION

The judgment is affirmed.



      NICHOLSON      , Acting P. J.



We concur:


      ROBIE      , J.


      MURRAY      , J.