Filed 12/4/14  P. v. McCalipp CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059315 |
| v. | (Super.Ct.No. RIF1301693) |
| ERIC MARTIN MCCALIPP, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas E. Kelly (retired judge of the Santa Cruz Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6, of the Cal. Const.), Jean P. Leonard and Michael B. Donner, Judges.  Affirmed.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Eric Martin McCalipp of domestic

1

violence (count 1; Pen. Code, § 273.5, subd. (e)(1))[1] and found true an allegation

defendant personally inflicted great bodily injury on the victim (§§ 12022.7, subd. (e),

1192.7, subd. (c)(8)).[2] Defendant admitted he had suffered two prior strike convictions

(§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)(A)) and one prior prison term (§

667.5, subd. (b)). The court sentenced defendant to an aggregate term of incarceration of

29 years to life. On appeal, defendant contends the court prejudicially coerced the jury

into rendering a verdict after the jury informed the court it was hung. We affirm.

### FACTUAL HISTORY

On December 1, 2012, defendant came home drunk from work to the residence at

which he lived with his girlfriend, the victim. Brenda Lewis, a homeless friend of the

victim, was living temporarily at the residence as well. Defendant argued with Lewis

about whether she should leave the residence.

Defendant became upset with the victim, grabbed her hair, yanked her off the bed

onto the floor, dragged her to the closet, pushed her face down onto the tile floor four or

five times where he held it there long enough to make her unable to breathe, and

strangled her. He pulled out of some of her hair. Defendant then lifted the victim's head,

punched her in her left eye, and slapped her across her jaw line.

Defendant said, "'I told you that [bitch], she thought she was going to take your

place. If I would have killed you and snapped your neck. Next I was going to snap that

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury found defendant not guilty of the second count charge of criminal threats (count 2; § 422).

2

[bitch's] neck and kill her and bury her next to you.'" The victim was afraid she was going to die. Defendant released her and left the house thereafter.

The victim was faint and could not walk, so Lewis helped her up. The victim was bleeding from her nose and throwing up blood. She had a black eye. The victim was taken by ambulance to the hospital. She was kept overnight in the emergency room where she was treated for a facial fracture. The physician who treated the victim testified she suffered from an orbital blowout fracture, which could be caused by blunt force trauma such as a punch.

Beaumont Police Officer Grant Zemel was working on December 1, 2012, when dispatched to investigate the incident. Upon arriving at defendant and the victim's home, Officer Zemel observed defendant crouched beneath the windshield in the driver's seat of a vehicle parked in the driveway. He contacted defendant and noticed the odor of alcohol.

Officer Zemel contacted the victim, who "was shaken up" and "[v]ery upset." The victim had swelling to her left eye, a bloody nose, and spit out blood. She informed Officer Zemel defendant had punched her three times.

LaTanya Adams testified she was in a relationship with defendant beginning in 2006 for close to a year. On January 6, 2007, defendant jumped on her, pulled her hair, and punched her in the head. Adams ended up in the hospital. Rialto Police Officer Joseph Maltese, who investigated the assault, contacted Adams at a Chevron station where she lay on the ground with blood around her ears and bumps on her left temple and forehead as a result of the dispute with defendant. Adams told Officer Maltese defendant

3

hit her with his fist five to six times.

Defendant testified that on December 1, 2012, he was dating and living with the victim. Lewis began living with them after the victim asked if Lewis could move in because she was homeless. On December 1, 2012, defendant came home; both the victim and Lewis were there. He engaged in a small verbal argument with the victim who then lunged at him scratching his face. He had no further physical contact with the victim. He returned to work.

When defendant returned home from work again, the victim and Lewis were still there. He told them he was taking them home.[3] The victim told defendant that if he left her, defendant would go to jail or be dead before morning. Defendant never punched or threatened the victim. He then went out to the car to wait for the victim and Lewis, where he began drinking and subsequently encountered a police officer.

Defendant testified he never punched Adams, he had only separated her from fighting with others. Defendant had a robbery conviction from 1992, two grand theft convictions, and pled guilty to a domestic violence charge in 2007. At the time of the instant incident, a protective order prohibiting defendant from having negative contact with the victim had been in place as a result of his plea to domestic battery two months earlier.

## DISCUSSION

Defendant contends the court prejudicially coerced the jury into rendering a

---

[3] Defendant testified the victim had a residence of her own in Pomona.

4

verdict by requiring that it continue its deliberations after it twice informed the court it was hung. We disagree.

On Thursday, May 30, 2013, after voir dire, Juror No. Three (JN3) indicated he had a child care issue; that his son had autism and that if the trial went too long, he could not afford to pay for his son's special schooling. The court noted they would probably be done with trial the next day: "So if it has to go over the weekend, then maybe we can cut you loose."

The jury retired to commence deliberations on Friday, May 31, 2013, at 4:30 p.m. At 4:45 p.m., the jury indicated it had selected its foreperson. Court adjourned until 9:00 a.m. on Monday, June 3, 2013.

On Monday, June 3, 2013, the jury resumed deliberations at 9:10 a.m. At 9:45 p.m., the court declined the jury's request for the police report. The jury heard a readback of testimony at 11:15 a.m. At 11:45 a.m., the jury indicated it was hung. The court released the jury for lunch at 12:00 p.m. It returned from lunch at 1:30 p.m.

The court then noted the jury had indicated it was hung "three not guilty and nine guilty, exactly what they should not have done pursuant to the jury instruction. But it's there. [¶] 'At this time, we don't feel further discussion will change this vote.' [¶] It's my understanding that they just started this morning."[4] The court indicated its inclination to read the jury an instruction from *People v. Moore* (2002) 96 Cal.App.4th 1105, 1118-

---

[4] Defendant's trial was presided over by Thomas E. Kelly, a retired judge sitting on assignment. Judge Kelly's assignment ended on May 31, 2013; consequently, beginning on June 3. 2013, the judge who took over and presided over the jury's deliberations was Jean P. Leonard, also retired and sitting on assignment.

5

1120 (*Moore*).  The People agreed.

At 1:40 p.m., the court asked the foreperson if the jurors had deliberated on both counts and if the jury was hung.  The foreperson responded that they had and that they were.  The court asked if there was anything the court could do to assist them in resolving the case.  The foreperson said there was not.

The court informed the jury, "I'm going to send you back and I'm going to ask you to continue to deliberate.  This—this is a felony case.  I don't believe that you've been working long enough to properly deliberate at this point to properly come to a decision.  Some of the morning actually was spent listening to readback, so during readback you're not deliberating.  So at this point, I am going to send you back for the afternoon at least.  [¶]  Before I do that, I'm going to read a jury instruction to you that might help you in making your decision here this afternoon."

It then instructed the jury in the approved manner provided in *Moore*, *supra*, as follows:  "It has been my experience on more than one occasion that a jury that initially reported that it was unable to reach a verdict was ultimately able to arrive at a unanimous verdict.  Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented and without regard for the consequences of your verdict, regardless of how long it takes you to do so.

"It is your duty as jurors to carefully consider, weigh, and evaluate all the evidence presented at the trial, to discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors.

"In the course of your further deliberations, you should not hesitate to reexamine

6

your own views or to request your fellow jurors to reexamine theirs. You should not hesitate to change a view if you want—you once held if you are convinced it is wrong or to suggest that other jurors change their view if you are convinced that they are wrong. Fair and effective jury deliberations require a frank and forthright exchange of views.

"As you were previously instructed, each of you must decide this case for yourself, and you should do so only after a full and complete consideration of all the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge, if you can do so, without violence to your individual judgment. Both the People and the defendant are entitled to the individual judgment of each juror.

"You have the absolute discretion to conduct your deliberations in any way you deem appropriate. I suggest, however, that since you have not been able to arrive at a verdict using the method that you have chosen, that you consider changing the method you have been following, at least temporarily, and try some new method. For example, . . . you may wish to consider having different jurors lead the discussion for a period of time or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the other's position.

"By suggesting you should consider changes in your methods of deliberations, I want to stress I am not dictating or instructing you as to how to conduct your deliberations. I merely suggest you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and that each

juror consider and understand the views of the other jurors.

"The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions. I direct your attention to the instructions already given that relate to the basic duties of jurors and to how jurors should conduct themselves during deliberations. You should keep in mind these earlier instructions when considering the additional instructions, comments, and suggestions I have just made. I hope my comments and suggestions will be of assistance to you.

"You are ordered to continue your deliberations at this time. If you have other questions, concerns, requests, or any communications you desire to report to me, please put those in writing on the form—on the form my court deputy has provided you with. Have them signed and dated by your foreperson or any other members of the jury, and then please notify the Court after you do."

At 3:08 p.m., the jury indicated it was "'[s]till unable to come to [a] unanimous decision after much discussion.'" The court indicated its intent to release the jurors until the next day, when Judge Donner would begin presiding over the jury's deliberations. Defense counsel noted, "My only problem is that they've indicated at least now twice where they can't reach an agreement and they're kind of stuck. I mean, I know they haven't been deliberating very long and they only had the case since this morning. And I know that with—at least with [JN3], he said if it went beyond Monday or Tuesday, he would have child care issues. So I think that will cause a lot of problems."

At 3:20 p.m., the court informed the jury, "you really—as I said, you really haven't deliberated for a long time. I know it seems like a long time to you, but I'm

inclined to send you home at this point, have you come back tomorrow morning, sleep on it one night, and make the call tomorrow morning. [¶] I understand that somebody . . . has a child care problem." JN3 responded, "Yes. My youngest son, he is autistic so I have to do—I make money to make a payment because he had to go to school—speech school. So I do have to make a payment."

The court replied, "Okay. I'm going to have you come back tomorrow morning. And I doubt very much that you'll be here all day, but I don't know. I can't promise that." The court released the jury until 9:00 a.m. the next day so Judge Donner could deal with the issue: "It seems like it will probably be over fairly early."

On Tuesday, June 4, 2013, the jury resumed deliberations at 9:00 a.m. At 9:56 a.m., the court dealt with a jury request for another readback. At 11:25 a.m., the jury announced it had reached a verdict.

"Section 1140 provides, 'Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.' The determination whether there is a reasonable probability of agreement rests within the sound discretion of the trial court. [Citation.] 'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a

9

means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.""" [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 363-364.)

Here, the court acted within its discretion in determining that the jury had not deliberated for an appropriate amount of time before reasonably deciding it had irrevocably hung on both counts. At the time the court read the *Moore* instruction, the jury had not even deliberated for half a day. At the time the court released the jury to "sleep on it one night," the jury had not even deliberated for an entire day. When the jury reached a verdict, it had not even deliberated for a day and a half. The court acted within its jurisdiction, and without coercion, in requiring the jury to deliberate for slightly longer than a day before concluding it had reached an impasse.

Defendant contends the court coerced a verdict by forcing JN3 to participate in deliberations beyond the period in which he needed to return to work. However, we note the record nowhere reflects at which point JN3 expressed that he needed to return to work. Defense counsel indicated JN3 said he would encounter problems if he had to participate on the jury beyond Monday or Tuesday. However, the record does not reflect JN3 expressing such a definitive date. Regardless, JN3's jury service did not continue beyond Tuesday. Thus, there is no showing JN3 was coerced into rendering a verdict so as to meet his obligations. This is especially true considering the record does not reflect whether he was of the nine jurors in agreement to convict or the three voting not guilty.

Defendant additionally maintains the court's expression that it did not believe *it* would take very long and that *it* would probably be over fairly soon reflected a coercive

10

influence suggesting that reaching a verdict should be relatively easy. Although this is certainly one interpretation of the court's statements, another could be that the court anticipated that upon Judge Leonard's replacement by Judge Donner the next day, JN3 would be released due to his obligations. Regardless, the jury did come to relatively quick verdicts the next day, one that had apparently switched to defendant's favor.[5] We find no coercive influence by the court. (*Moore*, *supra*, 96 Cal.App.4th at p. 1121 [no coercion where court neither directed jury to reach a verdict nor placed constraints upon any individual juror]; *People v. Pride* (1992) 3 Cal.4th 195, 266. ["[T]he direction to continue deliberations could only have been perceived as giving jurors an opportunity to enhance their understanding of the case, rather than as pressure to reach a verdict"].)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

HOLLENHORST

Acting P. J.

RICHLI

J.

---

[5] The jurors had previously indicated they were deadlocked in favor of guilty on both counts.

11