Filed 7/13/15  P. v. Neaves CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LORENZO EDWARDO NEAVES,<br><br>    Defendant and Appellant. | C071676<br><br>(Super. Ct. No. 11F06194) |

A jury convicted defendant Lorenzo Edwardo Neaves of oral copulation with T.M., a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b)--count one),[1] but acquitted him of both digital penetration of T.M. (§ 288.7, subd. (b)--count two) and touching T.M.'s vagina (§ 288, subd. (a)--count three).  In a trial by court, the court found defendant had a prior strike conviction (first degree burglary).  Defendant was sentenced to 30 years to life.

---

[1]  Undesignated statutory references are to the Penal Code.

1

On appeal, defendant contends the court erred by (1) instructing the jury, in accordance with *People v. Moore* (2002) 96 Cal.App.4th 1105 (*Moore*), to continue deliberating after it declared itself deadlocked, (2) admitting evidence of uncharged sexual offenses, and (3) miscalculating his presentence custody credits by two days. We reject defendant's first two contentions, but agree with his third claim.

### Statement of Facts

### Prosecution's Case

**Charged Acts**

In July 2011, Ty.L. was living in an apartment with her nine-year-old daughter T.M., her two sons aged four and five, a female roommate, and defendant who was her boyfriend. On July 7, several people were partying at the apartment because Ty.L. was moving out. Catherina Wilson and her boyfriend, Charles Fisher, were at the apartment and were intending to stay the night. Ty.L. told Wilson that when she and Fisher wanted to lie down she could take T.M. off of the bed and put her on the couch in the living room. Around 10:00 or 11:00 p.m., Wilson put T.M. on the couch.

T.M. testified that while she was sleeping on the couch, she was awakened by defendant kneeling beside her and taking off her pajamas, which consisted of a combination skirt and shirt and her underwear. Defendant touched her vagina with his hand, poked inside her vagina with his finger, which hurt, and licked her vagina. This activity lasted about 10 minutes. Defendant told her not to tell anyone and then went back into Ty.L.'s bedroom. T.M. cried, put her skirt and underwear back on, but got her underwear on backwards, which others noticed after she got up in the morning.

That same morning, T.M. told her mother and several others that "Gator," defendant's nickname, had used his hand to open her vagina and then licked her vagina. An investigating officer testified that T.M. told him that defendant had orally copulated her, but she denied that digital penetration had occurred. T.M. denied having told the officer that digital penetration had not occurred.

**Uncharged Acts**

Nathan B., 24 years old at the time of trial, testified he was defendant's brother. Nathan denied that defendant had done anything to him sexually when he was eight or nine years old. However, David Ford, formerly a detective with the Sacramento Police Department, testified that when Nathan was nine years old he interviewed him at an elementary school regarding his having been sexually assaulted. Nathan told Ford that while Nathan was lying on the bed in defendant's bedroom playing with some puppies, defendant masturbated and got "cum" on one of the puppy's heads. Defendant then "made the dog suck his penis." Defendant, who was wearing boxer shorts, then got behind Nathan and started humping him. Nathan told their mother and she called the police. Nathan B. also told Ford that when he was eight years old, defendant got into the shower with him and put "the dick on my bootie and pushed it inside my butt."

Jessica J., 26 years old at the time of trial, testified that in March 1999 she was about 13 years old and a student in junior high school and had gone to Rancho Cordova High School looking for her cousin and a friend when she saw defendant, with whom she was acquainted. Defendant offered to help her look and took her hand. As they walked by a bathroom defendant pushed her partway into it, grabbed her hand and put it down his pants. When she pulled away he tried to unbutton her pants, but she was able to pull away and run. After finding and telling her friend what happened, she was taken to the office to report the matter to the police.

## Defense Case

Tianna Saffel, who was pregnant with defendant's child, testified that about a week after defendant purportedly molested T.M. she moved with him to Reno. There, they had an on-and-off relationship until he was arrested in October 2011 on the molestation charge. While in Reno, defendant received text messages and naked photographs from a cell phone with a phone number similar to Ty.L.'s. Saffel also overheard the woman say, "You are not with me, how could you leave us, how could you

3

leave my children." After defendant's arrest, Saffel examined defendant's cell phone and discovered text messages that he was still communicating in a romantic way with the woman who she believed was Ty.L.

Defendant's mother, Lynette Baker, testified that Ty.L. called her and asked her to come to Ty.L.'s apartment. Baker complied and Ty.L. took her into a bedroom and told her that defendant had touched her daughter. Baker asked Ty.L. if she had called the police and she responded that she had not. Baker asked T.M. what happened and T.M said that defendant had touched her. Baker went home and, for the purpose of protecting defendant, called the police.

The next day, Ty.L. came to Baker's apartment and told Baker that she had made up the accusations against defendant because she did not want defendant to move with her. Ty.L. was chuckling as she told this to Baker. Baker told Ty.L. that she should call the police and let them know the accusations were made up.

Patricia Antonetti testified that she was an employee of Folsom Cordova Unified School District and defendant was one of the students she worked with. In March of 1999 she saw defendant and a female against a wall hugging and kissing. Antonetti had no recollection of whether force was being used, but stated if the contact had appeared forceful she would have intervened.

## Discussion

### I

Defendant contends that the trial court's instructing the jury, over his objection, to continue deliberating after it had declared itself deadlocked coerced the jury into reaching a decision, thereby violating his right to due process. We reject the contention.

Trial testimony was given over four days, ending on June 11, 2012. On June 12 the trial court completed instructing the jury and the jury commenced deliberations. On June 13, at noon, the jury sent the court a note stating the jury could not come to a unanimous decision. The court informed the parties that it was going to give "the

4

Firecracker instruction," an instruction approved by this court in *Moore*, which directed the jury to continue deliberations. Defendant objected on grounds that giving the instruction "invades the province of the jury" and "impermissibly intrudes on the jury's deliberations" in violation of federal and state due process and equal protection clauses. Unswayed, the trial court gave the *Moore* instruction, which, in its entirety, read as follows:

"In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine their's. You should not hesitate to change a view you once held if you are convinced it is wrong, or to suggest that other jurors change their views if you are convinced they are wrong.

"Fair and effective jury deliberations require a frank and forthright exchange of views. I remind you of that discussion we had earlier about the ideal juror respecting the views of every jurors [*sic*] and respecting their own views.

"As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges, *if* you can do so without violence to your individual judgment.[2]

---

[2]  In the original reporter's transcript filed in this case the last sentence of the quote omitted the italicized "if" and instruction read: "It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges. You can do so without violence to your individual judgment." After the briefs in this case were filed, the court reporter filed a correction to the transcript such that the instruction reads as we have quoted. Relying on the uncorrected version of the instruction, defendant has argued the instruction's omission of the word "if" caused the instruction to become "improperly coercive." Although we have not heard anything from defendant with regard to the reporter's correction, the corrected record obviates the need for us to address this argument.

"Both the People and the defendant are entitled to the individual judgment of each juror. As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

"May I suggest that since you have been under--since you have not been able to arrive at a verdict using the method you have chosen that you consider changing the methods you have been following, at least temporarily and trying new methods.

"For example, you may wish to consider having different jurors lead the discussions for a period of time, or you may wish to experiment with reverse role playing by having those on one side of an issue present and argue the other side's position and vice versa. This might enable you to better understand the other's positions.

"My suggestion you should consider changes in your methods of deliberations, I want to stress that I am not dictating or instructing you as to how to conduct your deliberations. I merely suggest that you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

"I also suggest you re-read CALCRIM Instruction 200, CALCRIM Instruction 3550. These instructions pertain to your duties as jurors, and they make recommendations on how you should deliberate.

"The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by the instructions.

"CALCRIM Instruction 200 defines duties of a juror.

"The decision the jury renders must be based on the facts and the law. You must determine what facts have been proved from the evidence received in the trial, and not from any other source.

"A fact is something proved by the evidence or by stipulation. Second, you must apply the law I state to you to the facts as you determine them, and in this way arrive at

your verdict. You must accept and follow the law as I state it to you regardless of whether you agree with the law.

"If anything concerning the trial said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions.

"CALCRIM 3550 defines the jury's duty to deliberate and recommends how jurors should approach their task. The decisions you make in this case must be based on the evidence received in the trial and the instructions given by the Court. These are matters--these are the matters this instruction requires you to discuss for the purpose of reaching a verdict.

"You should keep in mind the recommendations this instruction suggests when considering the additional instructions, comments and suggestions I have made in the instructions now presented to you. I hope my comments and suggestions may have been some assistance to you.

"You are ordered to continue your deliberations at this time. If you have any other questions, concerns, requests, or any communication you desire to report to me, please put those in writing on the form my bailiff has provided you with. Have them signed and dated by your foreperson, and then please notify the bailiff." (Italics added.)

Defendant argues the *Moore* instruction was coercive because it indicated the court's preference for a verdict, told the jurors to reexamine their view and change it if they were convinced that it was wrong, told them that it was their duty to deliberate with the goal of reaching a verdict, and failed to give the jury a cautionary instruction that a hung jury was a permissible result. The argument is meritless.

7

As to defendant's complaint that the instructions show the court's "preference for a verdict," rule 2.1036 of the California Rules of Court[3] supports such a preference. Rule 2.1036 provides in pertinent part: "After a jury reports that it has reached an impasse in its deliberations, the trial judge may, in the presence of counsel, advise the jury of its duty to decide the case based on the evidence while keeping an open mind and talking about the evidence with each other." In accordance with rule 2.1036, the court instructed the jury as follows: "As I previously instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charges, if you can do so without violence to your individual judgment."

There is no significant distinction between rule 2.1036 and the instruction given by the court. Both the rule and instruction simply represent the common-sense proposition that to the extent one becomes convinced that their position is wrong, change it.

As to defendant's complaint that the *Moore* instruction was coercive because "[i]t told [the jury] that it was their duty to deliberate with a goal of reaching a verdict" without informing them "that a hung jury was a permissible result," again he is wrong. In *People v. Gurule* (2002) 28 Cal.4th 557, the California Supreme Court observed that such an instruction need not be given because it could "improperly diminish[] the jury's duty to deliberate and reach a verdict if possible." (*Id*. at p. 660.) Accordingly, there was no error in not so instructing the jury.

Finally, we note, as do the People, that defendant's citations to *United States v. Bonam* (9th Cir. 1985) 772 F.2d 1449, at page 1450, and *United States v. Mason* (9th Cir.

---

[3] Undesignated rule references are to the California Rules of Court.

1981) 658 F.2d 1263, at page 1268, as authorities for the proposition that the trial court's failure to instruct the jury that a hung jury was a permissible result, "weighs heavily in favor of the conclusion that the defendant's right to a fair trial and impartial jury has been violated," do not stand for any such proposition. Nor has our research disclosed any case that does.

In sum, defendant has failed to establish that the *Moore* instruction was coercive in any aspect. Accordingly, his challenge on such grounds is rejected.

## II

Defendant contends the trial court abused its discretion under Evidence Code section 352[4] in admitting evidence of his prior uncharged sexual offenses against Nathan B. and Jessica J. for the purpose of proving his criminal disposition to commit sex offenses under Evidence Code section 1108, thereby violating his right to due process.

As to Nathan B., defendant argues that "although the evidence [of the acts] was not particularly inflammatory," evidence of them ran the danger of the jury's wanting to convict him as "revenge" for his having escaped punishment for the offenses; the 16 and 19 year remoteness of the acts deprived him of the ability to defend himself because of an inability to recall facts;[5] and the acts being only generally similar to the charges in the present case severely decreased their relevance. Indeed, as defendant sees it, the acts were no more than "teenage hormones and roughhousing between brothers."

---

[4] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[5] In his opening brief, defendant cited the offenses against Nathan B. and Jessica J. as being 23 and 26 years old and 26 and 29 years old. Following the People's noting defendant's math was inaccurate, defendant, in his reply brief, acknowledges the error, but still maintains his remoteness argument.

9

As to Jessica J., defendant argues the evidence's "probative value [was] so minimal, that it was non-existent" because the conduct was nothing more than a 15-year-old boy wanting to have sex with his 13-year-old female friend or girlfriend, which is "common teenage behavior which is not even criminalized."

Defendant's section 352 analysis is far from persuasive. "Before section 1108 was enacted, Evidence Code section 1101 governed the admission of prior criminal conduct, and a body of law developed concerning how similar the prior conduct had to be to the charged crime; the required degree of similarity varied depending on the use for which the evidence was offered. [Citation.] 'All of that radically changed with respect to sex crime prosecutions with the advent of section 1108. . . . [S]ection 1108 now "permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose*" [citation], subject only to the prejudicial effect versus probative value weighing process required by [Evidence Code] section 352.' [Citation.] 'In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101.' [Citation.] Or, as another court put it, '[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 63.)

Nathan B. was nine years old when defendant sodomized him in the shower and Jessica J. was 13 years old when defendant forcefully pulled her into a bathroom and tried to put her hand down his pants to touch his penis. These acts are a far cry from "roughhousing between brothers" and "common teenage behavior which is not even criminal"; instead, the acts constitute, at the least, felony conduct under section 288, subdivision (a), lewd and lascivious conduct with a child under age of 14 years. And

10

since section 288 is an offense specified in Evidence Code section 1108, subdivision (d)(1)(A), evidence of defendant's prior commission of such act or acts is "uniquely probative," and therefore highly relevant as to his commission of the presently charged acts.

As to defendant's claim that the jurors were inclined to convict him out of revenge for the lack of punishment for the uncharged offenses, this is not a reasonable possibility given defendant's admission that the evidence of the uncharged acts was "not particularly inflammatory" and that the jury acquitted him of the other two felony charges.

Accordingly, we find no abuse of the court's discretion in admitting the uncharged offenses.

## III

Defendant contends, and the People agree, that he is entitled two more days of presentence custody credit. We too agree. The trial court awarded defendant 273 days of actual custody plus 40 days for conduct, a total of 313 days.[6] The calculation apparently left out the day of defendant's arrest in Washoe County, Nevada. We will direct the court to credit defendant with 274 days actual custody plus 41 days for conduct, a total of 315 days of presentence custody credit.

---

[6] Because a violation of section 288.7, subdivision (b) is a violent felony (§§ 288.7, subd. (b), § 289, subds. (k)(1), (k)(2)), defendant's conduct credits are limited to 15 percent of days earned.

11

## Disposition

The trial court is directed to award defendant one additional day for actual custody and one additional day for conduct, a total of 315 days of presentence custody.  The trial court is directed to prepare an amended abstract of judgment and forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.

     BLEASE     , J.

We concur:

     RAYE     , P. J.

     HULL     , J.