Filed 9/16/16  P. v. Pozos CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FABIAN POZOS,<br><br>Defendant and Appellant. | C080166<br><br>(Super. Ct. No. 14F04240) |

A jury convicted defendant Fabian Pozos of first degree murder and found true an allegation that he personally used a deadly weapon in the commission of the offense. The trial court sentenced him to an aggregate term of 26 years to life in prison.

Defendant now contends his first degree murder conviction must be reduced to second degree murder because there was insufficient evidence of premeditation and deliberation.  Disagreeing, we will affirm the judgment.

BACKGROUND

Defendant resided in an apartment complex in Sacramento County for former foster youth who were homeless.  He moved into the complex in late May or early June 2014.  The victim and most of the witnesses also lived there.  Defendant and the victim, Maurice Lynch, had adjacent upstairs units with a shared kitchen that had lockable doors on each side.  Lynch's girlfriend, Autumn King, lived with Lynch.  Defendant and Lynch hung out together almost every day until June 20, 2014, the night of the murder.

1

After moving in, defendant began to flirt with Syra Drones, a downstairs neighbor with an eight-month-old daughter. Lynch thought defendant was sometimes too aggressive toward Drones and tried to prevent defendant from touching her. According to William Felix, another neighbor, defendant resented Lynch's intervention and said he was going to kill Lynch. Felix did not take the threat seriously because defendant seemed calm at the time.

On the night of the murder, a group of residents were gathered in Lynch's room. Defendant admitted to the others that he was drunk. When people in the room prepared to smoke marijuana, defendant offered to take Drones's baby to his room to protect her from the smoke. Drones told him no. Defendant and Drones both tugged on the stroller and defendant grabbed Drones and twisted her arm.

Lynch told defendant he was drunk and needed to leave. They exchanged words and pushes and Lynch punched defendant. Defendant said: "You are going to regret this." "You are going to die. Your bitch is going to die. Your whole family is going to feel this. You don't know who you are fucking with."

The two men continued their struggle into the kitchen. King pulled Lynch back and locked the kitchen door, leaving defendant trapped inside. Defendant banged on the door and repeated his threat to kill Lynch. King agreed to open the kitchen door and let defendant out if he would leave through Lynch's front door; defendant agreed to do so. As he left, he threatened again to kill Lynch and King. Drones testified defendant reentered the room with a knife in his hand. No other witness recalled him doing so, however. Drones and Dwayne Taylor, another downstairs neighbor, left the room; Taylor helped Drones carry the baby stroller downstairs.

King heard defendant reenter the kitchen from his own room, then talk to himself as he moved dishes and silverware. She suspected he was getting a knife. Lynch decided to go downstairs to report defendant to the housing program staff.

As Lynch left his room around midnight, Barry Leonard, an upstairs resident, was returning to his own room. Leonard saw defendant follow Lynch down the hallway and heard Lynch say, "I don't want to fight you." Coming back into the hallway from his room, Leonard saw defendant holding Lynch by his shirt as they faced each other against a railing. Defendant said, "Don't ever punch me again," then made a "stabbing motion" toward Lynch's chest. Lynch raised his shirt, exposing a bleeding wound on his left side. Video surveillance footage taken during these events was played for the jury during Leonard's testimony.

After returning to Lynch's room to retrieve property, Taylor sat down in the hallway to put on his shoes. As he did so, he heard Lynch tell defendant to calm down. Lynch then yelled and said he was going to get program staff. Taylor did not see the stabbing, but he saw Lynch lift his shirt, revealing a lot of blood on his chest.

Lynch made his way downstairs, followed by defendant, but collapsed on the ground. Defendant began pumping Lynch's chest, apparently trying to perform CPR. Taylor spotted a knife tucked behind defendant's leg.

Defendant went up to his room and came back with peroxide. During that time period he also disposed of a steak knife in the grass below his room. The knife, when recovered, proved to bear defendant's fingerprint and Lynch's blood.

When a sheriff's deputy arrived, defendant was holding a cloth bandage to Lynch's chest and saying, "I'm trying to help him out." He denied stabbing Lynch, whom he called his friend.

Lynch was pronounced dead at the scene at 12:14 a.m. An autopsy showed he died of a single stab wound to the left side of his chest. The wound was two and a half inches deep, made in a straight line from front to back. It pierced the rib cartilage and the heart.

A blood sample taken from defendant at the county jail sometime between 3:46 a.m. and 7:54 a.m. on June 21, 2014, showed a blood-alcohol level of 0.08 percent.

Defendant testified that he moved into the apartment complex three weeks before the date of the crime. He was friends with Lynch and Drones, but Drones was not his girlfriend. On June 20, 2014, defendant drank four 40-ounce beers and a pint of brandy, which got him drunk. He wanted to buy more alcohol but did not have identification, so he went to Lynch's room to ask someone to help him.

When defendant learned the group in Lynch's room was about to smoke marijuana, he offered to take Drones's baby out because he did not want them smoking in front of the baby. Drones got mad. Defendant tried to push her away from the stroller. Lynch intervened and the ensuing argument turned physical. They went into the kitchen and Lynch started choking defendant, who thought he would pass out. He remembered yelling at the group but could not remember what he said.

When defendant was released from the kitchen he went back to his room and reentered the kitchen from there. He grabbed a knife because he wanted protection when he went to the store, but he did not inform the police of this reason for having the knife.

Defendant encountered Lynch in the hallway and told him, "Don't punch me again." He might have pushed or punched Lynch, but he did not realize he was stabbing him until he saw the wound. Defendant testified he never meant to stab Lynch, the stabbing was accidental. But he did not tell the police he stabbed Lynch by accident. Feeling "horrible," he tried to help Lynch by getting peroxide to clean the wound. While going to his room for the peroxide, he threw the knife off the balcony.

Defendant claimed he had trouble with his thought processes stemming from childhood trauma in his native Mexico and in the United States. At age seven, he was sexually molested by a neighbor. Not long after, he discovered his father was also his grandfather. His father physically abused defendant and defendant's mother. After moving to the United States at age 13, defendant was placed in a group home because his father allegedly molested defendant's sister. Defendant was mistreated in the group

4

home, moved to a foster home, and eventually entered the program that ran the apartment complex.

Defendant claimed a history of depression, anger, and attempted suicide. He began drinking at age 14 and considers himself an alcoholic. He suspects the hard liquor he drank on the date of the crime caused him to lose control. He "can't rationalize well" when he drinks and he sometimes forgets what he does.

Defendant also presented the expert psychological testimony of Dr. Janice Nakagawa. Dr. Nakagawa testified that defendant suffers from alcohol dependence and posttraumatic stress disorder (PTSD) as a result of growing up with an abusive father and discovering that his father was also his grandfather. According to Dr. Nakagawa, defendant had an episode of PTSD on the date of the crime triggered by his desire to protect the baby from marijuana smoke, which resonated with his own experience as an unprotected child. Dr. Nakagawa said people think irrationally and suffer from overwhelming anxiety during PTSD episodes, and this may cause them to misconstrue the actions of others and explode in violence. Alcohol can exacerbate this reaction.

Although the current definition of PTSD requires a triggering event, Dr. Nakagawa admitted she did not trace defendant's PTSD to any single prior traumatic event. She also admitted that her opinion about defendant's PTSD episode was based on his description of his thoughts at the time, and she would be wrong if he was lying.

Defense counsel asserted in closing argument that defendant could not be convicted of first degree murder because (1) he acted under the combined influence of PTSD and voluntary intoxication, which prevented him from forming the intent to kill, or (2) he acted under heat of passion due to provocation, or (3) the killing was due to accident or misfortune. According to defense counsel, if defendant was guilty of any crime, it would be involuntary manslaughter because he lawfully carried a knife but handled it negligently while arguing with the victim.

5

The jury convicted defendant of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true an allegation that he personally used a deadly weapon in the commission of the offense (§ 12022, subd. (b)(1)). The trial court sentenced him to 25 years to life in prison, plus a consecutive one-year for the enhancement pursuant to section 12022, subdivision (b)(1), for an aggregate term of 26 years to life.

## DISCUSSION

Defendant contends his first degree murder conviction must be reduced to second degree murder because there is insufficient evidence of premeditation and deliberation.

Murder that is perpetrated by "willful, deliberate, and premeditated killing" is murder in the first degree. (§ 189.) "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).)

"Generally, there are three categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [(*Anderson*)], 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of

---

[1] Undesignated statutory references are to the Penal Code.

6

preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

When we review a contention that the evidence was insufficient to support the verdict, we apply the substantial evidence standard. We "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*) [applying standard to evidence of premeditation for first degree murder].) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] . . . [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence . . . it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]" (*People v. Redmond* (1969) 71 Cal.2d 745, 755; see *Johnson, supra*, 26 Cal.3d at pp. 576-577.)

Viewing the evidence in the light most favorable to the judgment, there is substantial evidence defendant murdered the victim with premeditation and deliberation. Days before the murder he said he was going to kill Lynch. After Lynch punched him, defendant told Lynch "You are going to regret this" and "You are going to die." While locked in the kitchen defendant repeated his threat to kill Lynch. Once released from the kitchen, he threatened to kill Lynch again, went back to his room, reentered the kitchen from there, and obtained a knife. Defendant followed Lynch into the hallway, told him "Don't ever punch me again," and stabbed Lynch in the chest. Defendant had time to think in the kitchen, in his own apartment, back in the kitchen, while following Lynch in the hallway, and before plunging the knife into Lynch's chest. All of the *Anderson* bases

7

-- planning, motive, and method -- are present.  (*Anderson, supra*, 70 Cal.2d at pp. 26-27; see *People v. Moore* (2002) 96 Cal.App.4th 1105, 1113-1114 (*Moore*) [defendant who intended to stab someone, lay in wait for a victim, then stabbed victim with full force in extremely vulnerable part of body, properly convicted of attempted willful, deliberate, premeditated murder].)  Defendant conducted "a manner of killing that was entirely consistent with a preconceived design to take his victim's life."  (*People v. Mayfield* (1997) 14 Cal.4th 668, 768.)  The evidence, when viewed most favorably to the judgment, more than satisfies the substantial evidence test for premeditation and deliberation.

Defendant argues there is no evidence of planning because after the first altercation with Lynch, defendant left the apartment and returned "moments later," stabbing Lynch in a "fit of drunken rage."  Defendant significantly understates the actual lapse of time and omits all the steps which showed his planning activity:  his return to his room, his subsequent reentry into the kitchen through his own door, his deliberate search for a weapon, and his waylaying of Lynch in the hallway.  Moreover, the jury evidently rejected the premise that defendant could not have formed the intent to kill because he stabbed Lynch in a "drunken rage."

Defendant also asserts there is no evidence of motive because "it was Lynch's aggressive assault on [defendant] that precipitated the stabbing, not any preconceived design to kill Lynch."  The argument confuses motive with planning, and in any event ignores well-settled law that premeditation and deliberation can occur in a very short time.  (*Koontz, supra*, 27 Cal.4th at p. 1080.)

In addition, defendant claims there is no evidence the manner of killing showed premeditation and deliberation because he used "a common steak knife found in the kitchen, which is used for eating, not killing" and which had not been "purchased for the purpose of killing someone."  His argument is contrary to law (*Perez, supra*, 2 Cal.4th at p. 1129 [obtaining a steak knife from the kitchen was indicative of planning activity]),

8

and we reject the suggestion that a defendant cannot plan a murder with existing common household items.

Defendant argues the fact he stabbed Lynch only once disproves premeditation and deliberation. He is mistaken. (See *Moore, supra*, 96 Cal.App.4th at pp. 1113-1114.) The fact that multiple stab wounds may prove premeditation and deliberation in a given case (see, e.g., *People v. Elliot* (2005) 37 Cal.4th 453, 471; *People v. Pride* (1992) 3 Cal.4th 195, 247-248) does not mean a single stab wound necessarily disproves premeditation and deliberation.

Ultimately, defendant reiterates his trial theory that Lynch's "vicious assault" caused defendant to stab him in an "uncontrolled fit of rage" fueled by defendant's drunken state and PTSD. But as we have explained, we must view the evidence in the light most favorable to the judgment to determine if there is substantial evidence to support the judgment. Reversal is not warranted merely because the jury could have reached a verdict consistent with defendant's trial theory.

The evidence of premeditation and deliberation is sufficient.

DISPOSITION

The judgment is affirmed.

/S/
MAURO, J.

We concur:


/S/
RAYE, P. J.


/S/
BUTZ, J.

9